Jerry PORTA, Plaintiff,

v.

Leo F. KLAGHOLZ, Commissioner of New Jersey Department of Education, the State of New Jersey, the Galloway Township School District, the Jersey City School District, Galloway Kindergarten Charter School Inc., Soaring Heights Charter School, and John Does # 3 to # 100, Defendant.

Civil Action No. 98–2350 (JBS).

United States District Court, D. New Jersey.

Sept. 4, 1998.

Thomas B. Duffy, Absecon, NJ, for Plaintiff.

Peter Verniero, Attorney General of New Jersey by John K. Worthington, DAG, Richard P. Hughes Justice Complex, Trenton, NJ, for Defendants, Leo Klagholz and the State of New Jersey.

Charlotte Kitler, General Counsel for The Jersey City Public Schools, Jersey City, NJ, for Defendant, Jersey City School District.

Fredric L. Shenkman, Goldenberg, Mackler, Sayegh & Mintz, P.C., Atlantic City, NJ, for Defendant, Galloway Kindergarten Charter Schools, Inc.

Jeremiah T. Healy, Oswin E. Hadley, Healy & Hadley, Jersey City, NJ, for Defendant, Soaring Heights Charter School.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

SIMANDLE, District Judge.

### I. INTRODUCTION AND PROCEDURAL HISTORY

Charter schools in New Jersey are a recent innovation through which public money funds the availability of a public education to pupils attending specially chartered schools under the Charter School Program Act of 1995, codified at N.J.S.A. 18A:36A–1, *et seq.* This case presents a challenge to the operation of two charter schools which hold classes

in church buildings, in space leased from those churches. The principal issue is whether the state and local public educational authorities violate the Establishment Clause of the First Amendment of the U.S. Constitution by providing funds for a public charter school in leased church space under the circumstances here presented.

This case was tried without a jury on July 20, 1998. That hearing was a consolidation of the trial on the merits and plaintiff's motion for a preliminary injunction, as permitted under Fed.R.Civ.P. 65(a)(2). As explained below, the court finds that the plaintiff is not entitled to the relief sought. This Opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

Plaintiff instituted this action on May 21, 1998 by. filing a Complaint with this court, seeking declaratory and injunctive relief against the following defendants: Leo F. Klagholz, Commissioner of the New Jersey Department of Education; the State of New Jersey; the Galloway Township School District; the Galloway Kindergarten Charter Schools, Inc.; and John Does # 1 to # 100. The Complaint sought both general and specific relief. In general terms, plaintiff sought to restrain the State of New Jersey and the New Jersey Department of Education from permitting the operation of charter schools out of church buildings. More specifically, plaintiff sought to enjoin the operation of Galloway Kindergarten Charter School ("GKCS") in the premises of Saint Mark and All Saints Episcopal Church ("Saint Mark"), in Galloway Township, New Jersey, where it was at that time operating. At the request of plaintiff, the court issued an Order on the same day requiring all defendants to show cause as to why a temporary injunction should not be granted.

Plaintiff subsequently filed an Amended Complaint dated June 8, 1998, adding as defendants the Soaring Heights Charter School ("SHCS") and Jersey City School Dis-

trict. The relief sought was the same as in the initial Complaint, except that plaintiff also sought specifically to enjoin the operation of SHCS out of Riverside Assembly of God Church in Jersey City, New Jersey. The court amended its Order to Show Cause to include the added defendants and to postpone the hearing until July 20, 1998.

The Amended Complaint asserts that the operation of these charter schools in church facilities violates the Establishment Clause of the First Amendment to the United States Constitution.[1] Count One is brought under 42 U.S.C. § 1983, alleging violations of the Due Process Clause of the Fourteenth Amendment, and seeking a declaratory judgment and preliminary and permanent restraints. (Compl.¶ 24.) Count Two is brought under 28 U.S.C. §§ 2201 and 2202 (which provide for the imposition of declaratory judgments and any further relief based upon a declaratory judgment) and seeks essentially the same relief. The declaratory judgment sought by plaintiff is that "operating a public charter school inside a church is a violation of the Establishment Clause of the First Amendment." The preliminary and permanent restraint sought by plaintiff is an injunction "restraining the defendants from operating or funding, as the case may be, a public charter school, including but not limited to GKCS and SHCS, inside a church in the future." (Compl.¶¶ 27–28.)

In lieu of an Answer, defendant the State of New Jersey filed a motion to dismiss plaintiff's Complaint. In addition to opposing the plaintiff's claims on the merits, the motion to dismiss asserted that the plaintiff's claims under 42 U.S.C. § 1983 against the State and the State's Department of Education were barred by principles of sovereign immunity under the Eleventh Amendment. The State conceded, however, that plaintiff's claims for injunctive relief could proceed against defendant Leo F. Klagholz, Commissioner of the New Jersey Department of Education, in his individual capacity.

---

1. The First Amendment to the U.S. Constitution states:

   *Congress shall make no law respecting an establishment of religion,* or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. [Emphasis added.]

Defendant GKCS likewise filed a motion to dismiss in lieu of an Answer. GKCS asserted that its lease at the Saint Mark Church had ended, and that the school was no longer operating out of that facility. A certification to that effect by Master Teacher Deborah Nataloni was submitted in support of the motion. GKCS asserted that the claims against it should therefore be dismissed as moot.

As a result of settlement discussions prior to the trial, the parties announced at the beginning of trial on July 20, 1998, that plaintiff was withdrawing his claims against defendant GKCS. (Tr. at 6.)[2] Both parties stipulated that they did not intend to seek attorneys fees under 42 U.S.C. § 1988, nor Rule 11 sanctions against the other.[3] (Id.) An Order to this effect was subsequently filed by the court on July 23, 1998, dismissing with prejudice plaintiff's complaint against GKCS. The parties likewise stipulated that the plaintiff agreed to dismiss the State of New Jersey as a defendant, leaving undisturbed the claims against Commissioner Klagholz.[4] (Tr. at 27–28.) An Order dismissing defendant the State of New Jersey's Motion to dismiss, and dismissing plaintiff's Complaint against the State of New Jersey in its entirety was subsequently filed by the court on July 27, 1998.

The trial without jury then proceeded on the same day, July 20, 1998, and the court heard testimony and received other evidence. Closing arguments were heard the following week.

## II. PRELIMINARY QUESTIONS

### A. Justiciability

▮▮▮ As a threshold matter, the court must determine whether this case is properly before us such that we have the power to adjudicate it. The jurisdiction of federal courts is defined and limited by Article III of the Constitution. See, e.g., Flast v. Cohen, 392 U.S. 83, 94, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The judicial power of federal courts is constitutionally restricted to "cases" and "controversies"—that is, "questions presented in an adversary context ... capable of resolution through the judicial process". Id. at 95, 88 S.Ct. 1942. The question of whether the plaintiff has presented a case or controversy that is justiciable by the federal courts is addressed through inquiry into issues such as whether the plaintiff is in essence seeking an advisory opinion; whether the plaintiff has standing to bring the suit, and whether the controversy is moot. Id.

### 1. Prohibition of Advisory Opinions

▮▮▮ The "core" of Article III's limitation on federal judicial power is that federal courts may not issue advisory opinions. E. Chemerinsky, Federal Jurisdiction at 47 (Little Brown, 1994); Flast, 392 U.S. at 96–97, 88 S.Ct. 1942. Accordingly, it is well established that two criteria must be met for a case to be justiciable: First, there must be "an actual dispute between adverse litigants," and second, there must be a "substantial likelihood that a federal court decision in favor of a claimant will bring about some change or have some effect." Chemerinsky at 48–50. It is permissible for a federal court to issue relief in the form of a declaratory judgment only so long as the above two justiciability requirements are met. See Nashville, C. & St. L. Ry. v. Wallace, 288 U.S. 249, 264, 53 S.Ct. 345, 77 L.Ed. 730 (1933).

**2.** References to "Tr." are to the trial transcript of July 20, 1998.

**3.** After placing this stipulation on the record, plaintiff requested an opportunity to elicit testimony from GKCS Master Teacher Deborah Nataloni and GKCS Trustee Gair Helfrich regarding the reasons why GKCS had not renewed its lease with Saint Mark. (Tr. at 6:19–22.) When the court questioned the relevance of this testimony, plaintiff suggested that it might be relevant to the question of who was the "prevailing party" for attorneys fees purposes, and noted that although he did not intend to seek attorneys fees against defendant GKCS, he might seek fees against another party, such as the State of New Jersey. (Tr. at 7:3–16.) The court permitted the testimony to go forward, without passing on whether such testimony would in fact be relevant. (Tr. at 4–9:12.)

**4.** Plaintiff declined to stipulate that the dismissal of the claims against GKCS rendered the GKCS-related claims against Commissioner Klagholz moot, asserting that these claims were capable of repetition yet evading review. (Tr. at 32:25–33.)

■ As a threshold matter, it appears that part of the relief sought by plaintiff is not available from this court due to the limitations on federal court power outlined above. In addition to seeking an injunction restraining the operation of SHCS on the premises of Riverside Assembly of God Church and GKCS on the premises of Saint Mark, plaintiff's complaint also seeks a declaratory judgment that "operating a public charter school inside a Church is a violation of the Establishment Clause of the First Amendment to the U.S. Constitution." (Am. Compl. at ¶ 27.) We have been presented with no authority (let alone binding authority) for the proposition that the operation of a public charter school in a church premises is *per se* a violation of the Establishment Clause. Thus it appears that plaintiff wishes for this court to issue that broad declaration as a new *per se* constitutional rule. It cannot be said that this question is an "actual dispute between adverse litigants," as we do not have before us all the parties who might now or at some time in the future intend to operate a public charter school from a church premises; rather, the only parties before us who are in an actual adversary relationship are the parties relating to the Soaring Heights Charter School (and perhaps—depending upon the resolution of the mootness question, below, the remaining parties relating to GKCS). It likewise is not the case that there is a "substantial likelihood" that the issuance of such a broad declaration in favor of plaintiff would bring about some change or have some effect, since it is not even known whether, at this time, there are any other charter schools apart from SHCS operating in church premises, nor whether any person has any intention of operating a charter school out of a church building. Accordingly, the broad declaratory judgment sought by plaintiff fails to meet the well established requirements of justiciability, and this court lacks the power to consider issuing such a broad declaration. Accordingly, as a threshold matter this court may only consider the plaintiff's specific challenges to the operation of SHCS (and perhaps GKCS) in church premises, and may not consider the broader declaratory relief sought by plaintiff. To the extent, then, that plaintiff seeks a declaratory judgment that "operating a public charter school inside a church is a violation of the Establishment Clause," such relief must be denied for lack of justiciability.

### 2. *Standing*

■ The instant case is a challenge by a New Jersey citizen and taxpayer, Jerry Porta, to the application of a facially constitutional state funding statute as applied by a state administrative agency, also known as an "as applied" challenge. Although the Supreme Court has never explicitly addressed the question of state taxpayer standing to bring an "as applied" Establishment Clause challenge to a state statute in federal court, the Supreme Court has on several occasions considered the merits of such cases, without questioning the plaintiffs' standing. *See Hunt v. McNair*, 413 U.S. 734, ·735–736, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 744, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976). In *Hunt*, the Court considered an Establishment Clause challenge by a "South Carolina taxpayer" to the use of a state educational funding Act to provide funding, through the issuance of revenue bonds, for the benefit of a Baptist-controlled college.[5] 413 U.S. at 735, 93 S.Ct. 2868. The court reached the merits to uphold this application of that statute, without ever questioning the standing of the plaintiff. Likewise in *Roemer*, the court considered an Establishment Clause challenge to the application of a Maryland statute which provided for annual grants to private colleges for non-sectarian purposes, the recipients including religiously-affiliated institutions. 426 U.S. at 739, 96 S.Ct. 2337. Although the court did not explicitly inquire into the plaintiffs' standing, it did note that the plaintiffs "are four individu-

---

5. The issuance of these bonds under that Act did not obligate the State, directly or indirectly, to pay the principal or interest on the bonds, and did not implicate the State's taxing power. *Hunt*, 413 U.S. at 737, 93 S.Ct. 2868. Accordingly, it appears that a state taxpayer's standing to bring an Establishment Clause "as applied" challenge to a state statute is not contingent upon the plaintiff showing that state taxpayer funds will actually be used in the challenged activity.

al Maryland citizens and taxpayers," and noted that two organizations, the American Civil Liberties Union and Protestants and Other Americans United for Separation of Church and State, were also plaintiffs in the suit at its outset, but were dismissed by the District Court for lack of standing. *Id.* at 744, and n. 8, 96 S.Ct. 2337. In the context of a federal taxpayer's challenge to a federal administrative agency's application of a federal spending statute, the Court explicitly relied on these cases to support finding federal taxpayer standing. *Bowen v. Kendrick,* 487 U.S. 589, 618–619, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988)(citing *Hunt,* 413 U.S. at 735–36, 93 S.Ct. 2868; *Roemer,* 426 U.S. at 744, 96 S.Ct. 2337). In light of the *Hunt* and *Roemer* cases, as interpreted in *Bowen,* plaintiff in the instant case appears to have standing to bring this "as applied" Establishment Clause challenge to the New Jersey Charter Schools Act.[6]

### 3. *Mootness*

■ Although a person may have standing, the court may be prevented from exercising jurisdiction if the matter is moot. *See e.g., Wilmington Firefighters Local 1590 v. City of Wilmington,* 824 F.2d 262, 266 (3d Cir.1987). Courts may not render opinions in moot cases, because to do so would be to issue an advisory opinion. Therefore, when a challenged activity ceases, the court "must ask if there exists a 'subject matter upon which the judgment of the court can operate' to make a substantive determination on the merits." *New Jersey Turnpike Auth. v. Jersey Cent. Power and Light,* 772 F.2d 25, 30 (3d Cir.1985). The Third Circuit has held that a case may be moot in two instances: first, when the alleged violation has ceased, and there is no reasonable expectation that it will recur, and second, where interim relief or other events completely and irrevocably eradicated the effects of the alleged violation. *Id.* at 31. Accordingly, a case is not moot if the dispute between the parties is "capable of repetition, yet evading review." *See United*

*States v. Antar,* 38 F.3d 1348, 1356 (3d Cir. 1994).

■ In the instant case, it appears that the claims against defendants Klagholz and the Galloway Township School District relating to GKCS are moot. GKCS has terminated its lease with the Saint Mark church, and will not be holding classes there in this coming school year. (Tr. 11:1 to 12:4.) In addition, the court credits the testimony of GKCS Master Teacher Deborah Nataloni and GKCS Trustee Gair Helfrich that the decision not to renew the lease was made prior to the filing of this lawsuit, due to the church's dissatisfaction with the shared space arrangement, and that the discontinuance of the leasing arrangement is not in any way the result of efforts to evade review of the arrangement by this court. (Tr. 12:5–12, and 14:19–23, and 20:8–18, and 25:19–20.) The court likewise credits the testimony of Gair Helfrich that there is no possibility of the church reconsidering its decision to discontinue the lease relationship with GKCS. (Tr. 12:2–4; 20:15–18.)

■ Plaintiff asserts that the claims against defendant Klagholz and defendant Galloway Township School District are not moot because the alleged violations by these defendants are capable of repetition, yet evading review. A paradigm example of a wrong capable of repetition yet evading review is found in a case cited by plaintiff, *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In that case the plaintiff was pregnant when she filed her complaint, which challenged the constitutionality of a state law prohibiting abortion. By the time the plaintiff's case reached the Supreme Court, she was no longer pregnant and no longer sought an abortion. The Supreme Court declined to dismiss on mootness grounds, explaining that the duration of pregnancy was inherently likely to be shorter than the time required for federal court litigation, and that the claim was therefore capable of repetition yet evading review. *Id.* at 125, 93 S.Ct. 705. In order for a matter to

---

**6.** Unlike *Hunt,* in which the case had originated in State court, in the *Roemer* case had originated in Federal District Court, and the court had addressed the question of the plaintiffs' standing.

This further supports our finding that plaintiff in the instant action has standing to sue in this court.

fit within this exception to the mootness doctrine, it must meet the threshold requirement of being the type of injury that is of inherently limited duration so that it is likely to always become moot before a federal court litigation is completed. *See e.g., Carroll v. President & Commrs. of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968)(challenging ten-day restraining order on a protest demonstration); *Nebraska Press Assoc. v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)(challenging prior restraint on media reporting regarding a murder trial); *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969)(challenge to election laws for impending election). In contrast to these cited cases, the injury alleged by plaintiff in the instant suit is not of inherently limited duration. As reflected in the testimony of GKCS Trustee Gail Helfrich, there is no possibility of the school returning to that church—not even in an emergency. (Tr. 12:17 to 13:2.) If GKCS were to return to the church premises contrary to these expectations, there is no reason why sufficient opportunity for judicial review would be lacking.[7] Accordingly, the claims against defendant Klagholz and defendant Galloway Township School District regarding GKCS shall be dismissed as moot.

### B. *Lemon/Agostini Analysis*

■ Before turning to specific fact finding, it is helpful to sketch the legal landscape upon which plaintiff's claim of violation of the Establishment Clause will be adjudicated. In *Lemon v. Kurtzman*, 403 U.S. 602, 612–613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court established a three-part test for determining whether an Establishment Clause violation exists. Under the *Lemon* test, the challenged activity will be unconstitutional if any of the following is true: (1) it has a non-secular purpose; (2) it has a principal or primary effect that either advances or inhibits religion; or (3) it fosters an excessive government entanglement with religion. *See id.* In a recent decision, the Supreme Court has modified the appropriate analysis. *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (holding that program sending public school teachers to parochial schools to teach remedial education pursuant to Title I of the Elementary and Secondary Education Act, 20 U.S.C. § 6301, *et seq.*, did not violate the Establishment Clause). The Court essentially collapsed the *Lemon* test so that the focus is on whether the challenged activity has the effect of advancing religion. *Id.* at 2015. The Court uses three primary criteria to make this evaluation. Specifically, the challenged statute violates the Establishment Clause if it either (1) results in government indoctrination of religious beliefs, (2) defines its recipients by reference to religion, or (3) creates an exces-

7. Plaintiff also cites to *Super Tire Engineering Company v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), in support of the proposition that this case is capable of repetition yet evading review; however, that case appears to weigh against, rather than for plaintiff's position. In *Super Tire*, the plaintiffs, New Jersey employers whose plants were subjected to an economic strike, brought suit for declaratory and injunctive relief against New Jersey officials, challenging State regulations that accorded benefits to striking workers. *Id.* at 120, 94 S.Ct. 1694. Before the case was tried, the labor dispute was settled and the strike ended. The union argued that the cessation of the strike rendered the case moot. *Id.* at 121, 94 S.Ct. 1694. The Court upheld the district court's finding that although the request for injunctive relief was moot, the request for a declaratory judgment still presented a live controversy. *Id.* at 121–22, 94 S.Ct. 1694. In reaching that decision, the Court noted the inherently short-lived nature of many labor strikes. *Id.* at 122, 94 S.Ct. 1694. The bulk of the court's reasoning, however, focused upon the fact that although the immediate detrimental effects of the economic strike had ended, the plaintiffs were still arguably being harmed by the ongoing conduct of the state—that is, by the ongoing availability of public assistance to striking workers, which potentially affects the balance of power in the collective-bargaining relationship. *Id.* at 122–124, 94 S.Ct. 1694. The court noted that "the challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Id.* at 122, 94 S.Ct. 1694. Thus, it appears that the decision in *Super Tire* was not premised exclusively upon the doctrine of harms capable of repetition yet evading review; rather, it was a case in which at least part of the harm was in fact ongoing. In contrast, in the instant case, not only is there nothing inherently short-term about the GKCS lease arrangement with Saint Mark, but there is also no ongoing injury.

sive entanglement between the state and religion. *Id.* at 2015–2016.

■ In the instant case, public school classes are taking place inside a church building pursuant to a lease between the charter school and the church. In the past, courts have upheld similar school-church lease arrangements on a case by case basis. *See, e.g., School District of Hartington v. Nebraska State Board of Education,* 188 Neb. 1, 195 N.W.2d 161 (Neb.), *cert. denied,* 409 U.S. 921, 93 S.Ct. 220, 34 L.Ed.2d 182 (1972) (upholding lease arrangement where public school authorities had full control over the classrooms and education program and no iconography was present in the classroom); *Thomas v. Schmidt,* 397 F.Supp. 203 (D.R.I.1975) (upholding lease arrangement where leased area which included a separate entrance and separate lavatories was under sole physical control of public school authorities who had issued written regulations governing the conduct of teachers and students); *but see Spacco v. Bridgewater School Dept.,* 722 F.Supp. 834 (D.Mass.1989) (enjoining a lease arrangement where religious symbols and messages were present throughout areas accessible to students and where the lease agreement included a promise not to teach anything that would offend Catholic teaching, with the archdiocese having curriculum control, and where a robed priest often greeted students at the school entrance). There is no presumption that the operation of a public school out of a church premises is a *per se* violation of the Establishment Clause. *See Agostini,* 117 S.Ct. at 2010 (rejecting assumptions made in *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) (overruled), and *School District of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3248, 87 L.Ed.2d 267 (1985) (overruled in part), that (1) any public employee who works on the premises of a religious school is presumed to inculcate religion in her work, (2) that the presence of public employees on private school premises creates a symbolic union between church and state, (3) that any and all public aid that directly aids the education function of religious schools impermissibly finances religious indoctrination, and (4) that there is a need to closely monitor public employees on religious premises which constitutes an excessive government entanglement).[8]

Finding it evident in the instant action that the SHCS lease arrangements possess the secular purpose of educating children,[9] this court shall apply the *Agostini* "effect" criteria. As explained below, we find that the SHCS lease arrangement does not violate the Establishment Clause, and judgment will be entered against plaintiff and in favor of all remaining defendants.

### III. FINDINGS OF FACT

Plaintiff Jerry Porta is a citizen of New Jersey, residing in the Township of Galloway. (Am.Comp., ¶ 6.) He is also a New Jersey and Galloway Township taxpayer. (*Id.*)

Defendant Klagholz is the New Jersey Commissioner of Education. (Am.Comp., ¶ 7.) He is responsible for the disbursement of New Jersey funds for education. (*Id.*) Defendant State of New Jersey collects these funds from taxpayers through such sources as sales tax and income tax. (Am.Comp., ¶ 8.)

Defendant SHCS received a charter from the New Jersey Commissioner of Education, pursuant to the New Jersey Charter School Act, N.J.S.A. 18A:36A, *et seq.* (Am.Comp., ¶¶ 11, 12.) Defendant SHCS operates one school, which is located in the facilities of Riverside Assembly of God Church at 317 Third Street in Jersey City. (*Id.,* ¶ 12.)

---

8. Plaintiff asserts that the elimination of the above presumptions in *Agostini* is inapplicable to the instant case because present in *Agostini* were the countervailing interests of both the Free Exercise Clause and the federal Title I mandate. (Pl. Re. Br. at 3, 7). Because these countervailing interests do not exist in this case, plaintiff argues that we should presume under *Aguilar* that charter school teachers on religious premises will inculcate religion (thereby impermissibly advancing religion) unless closely monitored by public school officials (thereby fostering an excessive government entanglement). (*Id.*)

The language of *Agostini* does not support this narrow reading. This court, therefore, declines to make plaintiff's leap of finding a *per se* violation in this case. Instead, we will adjudicate the case on its individual merits.

9. This is conceded by plaintiff. (Pl. R. Br. at 4.)

SHCS leases its school space from the church under what appears to be a fair market rental for commercial property, which was $45,000 for 1997/98, rising to $60,000 for 1998/99. (Tr. 55:19–22; 78:2–3; 89:13–20.)

■ Riverside Assembly of God Church ("Assembly of God"), in which defendant SHCS operates, is a two story rectangular brick building of fairly modern construction. (R. Brescia Cert., ¶ 2; Videotape at Ex. P–2.) [10] There are no religious symbols such as crosses, stained glass windows or church steeples on the exterior of the building. (Ex. P–2.) There is a sign, about 10 feet by 6 feet, on the west side of the building, which identifies the building as "RIVERSIDE ASSEMBLY OF GOD," gives the times of worship services, and contains the phrases, "COME PRAY WITH US" and "JESUS FORGIVES." (*Id.*) The main church entrance is on the north side. (R. Brescia Cert., ¶ 3.) SHCS, however, uses a separate entrance for the school on the east side, not within the sight of the church sign, and the school has its own prominent sign identifying "SOARING HEIGHTS CHARTER SCHOOL" at its main entrance. *Id.;* Ex. P–2.

There are no visible church signs or religious symbols, artwork, or literature within any classroom. (N. Lomba Cert., ¶ 9.) Soaring Height Charter School's charter contains the provision "All vestiges of religion will be removed to ensure adherence to the First Amendment." (Ex. D–2, at ¶ 12b.) The building has a secular appearance, being quite rectangular with a straight roofline, and is often used for public meetings. (Ex. P–2; N. Lomba Cert., ¶ 4.)

The *school is growing from five to six* classrooms. (Tr. 64:5–23.) The lease gives the school exclusive use of the rented space when school is in session, and the church·is permitted to use classroom space (not office space) when school is not in session (Tr. 56:3–18), although as a practical matter only one of the classrooms seems to be used most often by the church on weekends. (Tr. 64:19 to 65:5.) After the church uses a classroom a charter school teacher, Joan Incognito,

checks the classroom and "sweeps" any religious materials before school begins, delivering the materials to the pastor's office in another part of the church building. (Tr. 66:4 to 67:14.) Thus, the students have no exposure to religious materials. Similarly, church announcements on bulletin boards are masked by a cloth covering when school is in session, and the only unmasked bulletin board depicted photos of church members and contained no religious message. (Videotape, Ex. P–2; Tr. 70–72.)

The church building has an auditorium, which is the large assembly room for the congregation. There are no church functions during school hours. The auditorium is used as a school meeting space occasionally (Tr. 57:9–25), such as for singing and graduations. (Tr. 63:22–25.) On a wall of the auditorium is a small mural or stenciled design, perhaps 2 feet by 3 feet, portraying two doves and a heart, under which is a one-sentence biblical inscription about love. (Tr. 58:1–3.) When the school uses the auditorium space, the biblical inscription is always covered (Tr. ·58:3, 58:21–23, and 63:8–23.) At most other times, the auditorium doors remain closed and no student has access to that space. (Tr. 58:4–23.) The doves and heart are not covered because they present no sectarian message. Through these efforts, the court finds that the school has taken all reasonable and necessary steps to cover or remove vestiges of religion. (Tr. 59:15 to 61:10.)

SHCS had 84 students in the· 1997–98 school year, and it expects to matriculate 102 students at its facility for the new academic year starting now. (N. Lomba Cert., ¶ 7; Tr. 81:18–22.) The school's location in the church was by process of elimination, since the site was chosen as the only possible facility after an extensive search in a limited urban real estate market. (*Id.,* ¶ 6, 8.) SHCS teaches no religious instruction, has no prayer, and makes no references to God or religion. (*Id.,* ¶ 5.)

We have also carefully examined the relationship between the charter school and the

church in terms of selecting students, teaching curriculum, governance, and sharing of space. First, there is no connection between church membership and eligibility to attend SHCS. All students in kindergarten through grade four in Jersey City are eligible to apply, and 16 students are admitted for each grade; because of the popularity of this school, it has been oversubscribed, and the selection of all students has been through random lottery. (Tr. 81:23 to 82:17; 83:2–8; 83:17 to 84:12.) Religious belief or church membership plays no role in admission, nor, therefore, in the use of public funds for education of these pupils.

■ The curriculum is completely secular. (Tr. 78:24 to 79:4.) There is no religious instruction of any type. (Tr. 79:5–9.) The church's pastor has no teaching role. (Tr. 80:2–18.) The school's purpose is purely secular. (Tr. 78:21–23.) The school library contains no religious books. (Ex. P–2.) There is one minor lease restriction pertaining to Halloween decorations by the school, in which the school has agreed not to keep Halloween-type items on display because the church does not want depictions of witches, devils, ghosts, and the like. (Lease, 7/1/98, at ¶ 7.) The lease provision states, "Tenants shall insure that pictures, drawings, sketches, photographs, articles and other artifacts depicting the occult, cults, devils, witches, ghosts, skeletons, demons, warlocks, goblins, tarot card, horoscopes, vampires, gravestones, or other materials of a similar nature offensive to the Landlord shall not be displayed." (*Id.*) This lease provision does not prohibit teaching about these things, nor is it even clear that this lease provision would prevent a Halloween party during school hours. This restriction, rather, is aimed toward not permitting such Halloween items to be displayed when and where church members might see them and be offended, and indeed this is how the dean of the charter school, Nancy D. Lomba, interprets the restriction. (Tr. 55:7–14: "They don't care if we put them [Halloween items] up during the time we're there, but we need to take it off the wall when we leave because it would be offensive to them when they use the space when we're not there.") Thus, the court finds this restriction, even if based on Assembly of God church doctrine, has no impact upon the curriculum or activities of this public school.

SHCS is governed by a 13–member board of trustees. (Tr. 81:2–3.) The church's pastor is a member of the board as the landlord because the school, as tenant, felt "it would be a good way to communicate what we're doing." (Tr. 81:8–10.) The pastor is not a particularly active or vocal member of the board, since he often doesn't attend the board meetings. (Tr. 86:21 to 87:3.) The pastor's participation on the board of trustees as a landlord has not caused any religious-type impact upon the policies or governance of this public school.

SHCS has exclusive use of its rented space during school hours, and permanent exclusive use of its office space and many of the closets and storage rooms. The church has exclusive use of the pastor's office, which is located on the first floor but is not identified as a church office. (Ex. P–2; Tr. 64–65.) The pastor's office bears a sign which prohibits entry by children, and as a practical matter no school teacher or staff member enters the pastor's office either. (Ex. P–2) The auditorium space is seldom used by the school, the lease would give the church first priority of usage, and the lease requires that if the school uses the church's audio visual equipment that the landlord's technician is required to operate it. (Ex. P–3.) The "auditorium" has also been referred to as the "sanctuary" in the course of the videotape narration (Ex. P–20), but there is no sign identifying it as a sanctuary, no religious objects are present (other than the covered scripture verse), and there is no indication that this room has been religiously consecrated as a reverent or sacred space. Hallway spaces, lavatories and other common areas also bear no church-related markings. Finally, as noted, there is no indication that church functions coincide at any time with SHCS functions. Thus, the sharing of space between the church and school includes a mixture of exclusive and shared spaces and the complete elimination of overlap between school and church functions.

Overall, the relationship of the SHCS and the Riverside Assembly of God Church is as tenant and landlord. The church's doctrines, practices, worship services, architecture, and iconography are not manifested in the public school's teaching, curriculum, budget, policy, student selection, or governance. Other than the fact that some parts of the same building are used for church purposes on weekends, and that the pastor's office also occupies the same building, one could well visit the SHCS, enter by the school entrance, and not know that the building is even used for church purposes, all as confirmed by the video tape in evidence. (Ex. P–2.)

## IV.  CONCLUSIONS OF LAW

### A.  Jurisdiction

It is undisputed that the court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 (federal question jurisdiction), as this case arises under the Constitution and laws of the United States.

It is likewise undisputed that this court has personal jurisdiction over the parties in this case, as all the parties are located in the state of New Jersey.

### B.  Justiciability and Standing

As found in Part II.A.1, above, plaintiff's claim for a declaratory judgment that "operating a public charter school inside a church is a violation of the Establishment Clause" will be denied for lack of justiciability.

As discussed above in Part II.A.2, plaintiff Jerry Porta has standing to challenge the New Jersey Charter Schools Act as applied to the particular schools at issue, under the Establishment Clause of the First Amendment.

### C.  Mootness

As discussed in Part II.A.3, the court concludes that all plaintiff's claims arising from the Galloway Kindergarten Charter School (GKCS), including those against defendants Klagholz and the Galloway Township School District, are moot and shall be dismissed. On the other hand, plaintiff's claims attacking the Soaring Heights Charter School (SHCS) present a live case or controversy which shall be adjudicated herein, as SHCS is about to begin another school year as tenant of the Riverside Assembly of God in Jersey City.

### D.  Establishment Clause Analysis

Plaintiff seeks declaratory relief that no publicly-funded charter school in New Jersey may operate in space leased from a church, and more specifically that the SHCS's use of public funds to lease space from the Riverside church offends the Establishment Clause.

■■■ The court rejects plaintiff's assertion that the mere leasing of public school space in a church building, without more, violates the First Amendment's Establishment Clause. The Establishment Clause jurisprudence asks the essential question whether the challenged public activity has the effect of advancing or inhibiting religion. *Agostini v. Felton*, 117 S.Ct. at 2015. Such public advancement of religion may be shown by proof that it (1) results in government indoctrination of religious beliefs, or (2) defines its recipients by reference to religion, or (3) creates an excessive entanglement between the state and religion. *Id.* at 2015–2016.

Nothing about the Charter School Program Act itself advances religion on its face. Section 2 of the Act, N.J.S.A. 18A:36A–2, states the legislative policy to encourage and facilitate the development of charter schools "as part of the State's program of public education." [11]  The Commissioner of Edu-

---

11.  N.J.S.A. 18A:36A–2 states:
    The Legislature finds and declares that the establishment of charter schools as part of this State's program of public education can assist in promoting comprehensive educational reform by providing a mechanism for the implementation of a variety of educational approaches which may not be available in the traditional public school classroom. Specifi-

cally, charter schools offer the potential to improve pupil learning; increase for students and parents the educational choices available when selecting the learning environment which they feel may be the most appropriate; encourage the use of different and innovative learning methods; establish a new form of accountability for schools; require the measurement of learning outcomes; make the

cation, defendant Klagholz, is empowered to establish the charter school program and to grant charters. N.J.S.A. 18A:36A–3(a). A "charter school" is defined as "a public school operated under a charter granted by the Commissioner, which is operated independently of a local board of education and is managed by a board of trustees." *Id.* The local board of trustees "shall be deemed to be public agents authorized by the State Board of Education to supervise and control the charter school." *Id.* The application to establish a charter school must include, among other things, "a description of, and address for, the physical facility in which the charter school will be located." N.J.S.A. 18A:36A–5(j). The Act empowers the charter school to "[a]cquire real property from public or private sources, by purchase, lease, lease with an option to purchase, or by gift, for use as a school facility." N.J.S.A. 18A:36A–6(c). Discrimination in admission of students is prohibited in a charter school, implicitly including discrimination based upon religious membership or belief. N.J.S.A. 18A:36A–7.[12] Charter schools may not construct new facilities with public funds, and may be located in a public building "or any other suitable location," subject to the same health and safety regulations as other public schools. N.J.S.A. 18A:36A–10.[13] Funding of charter schools is through the local school district of residence according to a funding formula calculated on a per pupil basis, together with any categorical aid and federal funds attributable to the student; thus the local public school district, here, defendant Jersey City School District, plays only a ministerial role of disbursing funds on a pass-through basis in accordance with the Act's formula at the direction of the Commissioner of Education. Obviously, all these provisions of the Act underline the exclusively public character of the charter school while advancing no religious belief or agenda, hidden or overt.

Likewise, the court finds, as discussed in Part II.B, above, that the mere operation of a public charter school in leased space in church premises is not a *per se* violation of the Establishment Clause. The placement of a public school and public employees into leased space on church premises, consistent with the teachings of the Supreme Court in *Agostini*, does not in itself give rise to the presumption that religion is inculcated into the school, nor does it create a symbolic union between church and state, nor does the public payment of lease money in an arm's length lease finance religious indoctrination, nor does the lease agreement give rise to an excessive government entanglement with religion through any demonstrated reason to closely monitor public employees on the religious premises. *Agostini*, 117 S.Ct. at 2010.

■ Moreover, even under the more restrictive test of *Lemon v. Kurtzman*, 403

---

school the unit for educational improvement; and establish new professional opportunities for teachers.

The Legislature further finds that the establishment of a charter school program is in the best interests of the students of this State and it is therefore the public policy of the State to encourage and facilitate the development of charter schools. L.1995, c. 426, § 2, eff. Jan. 11, 1996.

**12.** N.J.S.A. 18A:36A–7 states:

A charter school shall be open to all students on a space available basis and shall not discriminate in its admission policies or practices on the basis of intellectual or athletic ability, measures of achievement or aptitude, status as a handicapped person, proficiency in the English language, or any other basis that would be illegal if used by a school district; however, a charter school may limit admission to a particular grade level or to areas of concentration of the school, such as mathematics, science, or the arts. A charter school may establish reasonable criteria to evaluate prospective students which shall be outlined in the school's charter.

Since a public school could not, consistent with Title IX of the Civil Rights Act, discriminate on the basis of a student's religion or lack of religious belief, so too is a charter school prohibited by this Act from doing so.

**13.** N.J.S.A. 18A:36A–10 states:

A charter school may be located in part of an existing public school building, in space provided on a public work site, in a public building, or any other suitable location. The facility shall be exempt from public school facility regulations except those pertaining to the health or safety of the pupils. A charter school shall not construct a facility with public funds. Thus, the Act itself does not preclude location in a private space including a church property, so long as the location is "suitable" and in compliance with health and safety regulations.

U.S. 602, 612–13, 91 S.Ct. 2105 (1971), the lease arrangement between a public charter school and a church will not offend the Establishment Clause if this arrangement for the expenditure of public funds has three characteristics: "first, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion [citation omitted]; finally, the statute must not foster 'an excessive government entanglement with religion' [citation omitted]." Public funding of this lease arrangement does not present a close question under the first and second prongs of the *Lemon* test, since the lease has a secular purpose of providing suitable space for conducting classes and administering the educational program, and the leasing of space neither advances nor inhibits religion, when the school is exclusively secular. Under the third prong, the "entanglement" is no different from the normal interface between landlord and tenant in leased space; money is paid for services received subject to conditions of use articulated in the lease and course of conduct.

Therefore, plaintiff has not demonstrated that the leasing of space by a public charter school in a church facility is a per se violation of the Establishment Clause, and his prayer for declaratory and injunctive relief in that regard will be denied.

■ Turning to the facts specific to the lease arrangement of the Soaring Heights Charter School in the Riverside Assembly of God Church, the court concludes that plaintiff has failed to show that the SHCS lease arrangement runs afoul of any of the three *Agostini* criteria, as follows.

First, plaintiff has not shown that the SHCS lease arrangement results in government indoctrination of religious beliefs. The court declines to presume that a church lease *per se* results in government indoctrination. We note that the Supreme Court in *Agostini* rejected a very similar presumption. 117 S.Ct. at 2016 ("we no longer presume that [properly instructed] public employees will inculcate religion simply because they happen to be in a sectarian environment"). Riverside Assembly of God is a modern, essentially non-descript building. (R. Brescia

Cert., ¶ 2.) There is no evidence of any religious iconography in the classroom area or in areas used by SHCS. The charter school uses a separate entrance from the church's main entrance. (*Id.*) The school's entrance is on the opposite side of the building from the only sign which identifies the building as a church and which contains religious messages. (*Id.*, ¶ 3.) Those religious messages are confined to the sign that identifies the church premises, and the same sign also restricts the message to the hours of religious services advertised thereon, namely, 12 Noon to 1:00 PM on Sundays. The school does nothing to endorse the message on the church's sign. Because the Assembly of God offers a sufficiently non-sectarian environment, government indoctrination does not result.

Second, the SHCS, as the recipient of public money under the Act, does not define its students, faculty, or governance by reference to religion. Plaintiff has not shown that SHCS chose to lease space at Assembly of God because it was religious. On the contrary, SHCS leased Assembly of God because it was the one possible facility found after an extensive search for affordable housing. (N. Lomba Cert., ¶ 6.) Indeed, the building is often used for public meetings. (*Id.*) Importantly, the school is open to all pupils in Jersey City, who are then selected by random lottery without any preference for religious belief or affiliation.

Third, plaintiff has not shown that the SHCS lease arrangement creates an excessive government entanglement with religion. There is no evidence of a relationship between Riverside Assembly of God and SHCS beyond that engendered by the landlord-tenant relationship pursuant to the lease. The court does not see how a commercial lease of essentially non-sectarian space in a building which is used for public meetings requires pervasive monitoring to prevent religious indoctrination, nor does the court see how the lease arrangement creates either excessive administrative cooperation between church and state or excessively increased risk of political divisiveness. *See Aguilar*, 473 U.S. at 413–414, 105 S.Ct. 3232 (1985) (finding excessive entanglement in Title I program

for these reasons), *overruled by Agostini*, 117 S.Ct. at 2015 (finding administrative cooperation and increased risk of political divisiveness insufficient by themselves to create an "excessive" entanglement in Title I cases). The fact that SHCS is located in a church has, in practice, placed no real restrictions or entanglements upon the normal functioning and independence of the school. For example, the school has exclusive use of its space during all school functions, the pastor's office is off limits and unidentified, and the lease agreement restricting school Halloween displays during times of church usage has no impact upon the curriculum. The church makes no use of the premises for worship services when the school is in session. The court finds, therefore, that SHCS's lease has not created an excessive entanglement.[14]

SHCS's lease arrangement at Assembly of God does not violate the Establishment Clause of the First Amendment. This lease arrangement does not result in government indoctrination of religious beliefs, it does not define its recipient by reference to religion, nor does it create an excessive entanglement between church and state. The court holds, therefore, that it does not violate the Establishment Clause for this public charter school to operate within a religious building pursuant to a standard commercial lease under these circumstances.

## V. CONCLUSION

For the reasons stated above, plaintiff's claims for declaratory and injunctive relief against the operation of the Soaring Heights Charter School will be denied, and plaintiff's claims regarding the Galloway Kindergarten Charter School will be dismissed as moot. Finally, plaintiff's claim for a declaratory judgment that operating a public charter school inside a church is a violation of the Establishment Clause will be denied for lack of justiciability. The accompanying Judgment will be entered in favor of defendants and against plaintiff.

## JUDGMENT

This case having been tried to the court without a jury; and

The court having reached a verdict, for reasons stated in the Findings of Fact and Conclusions of Law of today's date;

IT IS this 4th day of September, 1998, hereby

ORDERED and ADJUDGED that plaintiff's claims for declaratory and injunctive relief against defendants Leo F. Klagholz, Commissioner of New Jersey Department of Education, the Jersey City School District, and Soaring Heights Charter School are hereby DENIED;

IT IS FURTHER ORDERED AND ADJUDGED that plaintiff's claims for declaratory and injunctive relief against defendants Klagholz and Galloway Township Board of Education regarding the Galloway Kindergarten Charter School are hereby DISMISSED as MOOT;

IT IS FURTHER ORDERED AND ADJUDGED that plaintiff's claims for a declaratory judgment against the State Defendants that operating a public charter school inside a church is a violation of the Establishment Clause will be DENIED FOR LACK OF JUSTICIABILITY; and

IT IS FURTHER ORDERED AND ADJUDGED that Judgment be entered in favor of all Defendants and against Plaintiff, Jerry Porta, NO CAUSE FOR ACTION.

Costs to defendants Klagholz, Jersey City School District, and Soaring Heights Charter School.

14. As the Supreme Court in *Agostini* stated:
    Not all entanglements, of course, have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable, and we have always tolerated some level of involvement between the two. Entanglement must be "excessive" before it runs afoul of the Establishment Clause.
    117 S. Ct. at 2015 (citations omitted).