727 A.2d 15 (1999)
320 N.J. Super. 174
In the Matter of the GRANT OF the CHARTER SCHOOL APPLICATION OF ENGLEWOOD ON the PALISADES CHARTER SCHOOL.
In the Matter of the Grant of the Charter School Application of the Classical Academy Charter School of Clifton, Passaic County.
In the Matter of the Grant of the Charter School Application of the Franklin Charter School, Somerset County.
Superior Court of New Jersey, Appellate Division.
Argued February 3, 1999.
Decided March 29, 1999.
*19 Michael V. Camerino, for appellant Englewood City Board of Education (Mauro, Savo, Camerino & Grant, Somerville, attorneys; Eric Martin Bernstein, Three Bridges, and Mr. Camerino, on the brief).
Anthony V. D'Elia, Hackensack, for appellant Clifton Board of Education.
Russell Weiss, Jr., Lawrenceville, for appellant Franklin Township Board of Education (Carroll, Weiss & Josephson, attorneys; Mr. Weiss, on the brief).
Arlene Goldfus Lutz, Deputy Attorney General, and Michelle Lyn Miller, Deputy Attorney General, argued the cause for respondent State Board of Education (Peter Verniero, Attorney General of New Jersey, attorney; Joseph L. Yannotti, Assistant Attorney *20 General, of counsel; Ms. Lutz and Ms. Miller, on the brief).
Lois H. Goodman, Newark, for respondents Englewood on the Palisades Charter School, Bergen County and Classical Academy Charter School of Clifton, Passaic County (Carpenter, Bennett & Morrissey, attorneys; Ms. Goodman and Stephen F. Payerle, of counsel; Melissa B. Popkin and Catherine A. Trinkle, on the brief).
David C. Apy, Newark, for respondent Franklin Charter School (McCarter & English, attorneys; Mr. Apy, on the brief).
John G. Geppert, Jr., Morristown, amicus curiae Morris School District (Wiley, Malehorn & Sirota, attorneys; Christina L. Davis, on the brief).
Before Judges KING, WALLACE and FALL. *16 *17
*18 The opinion of the court was delivered by KING, P.J.A.D.

I
In this consolidated opinion we address challenges by three school districts to various aspects of the Charter School Program Act of 1995, N.J.S.A. 18A:36A-1 to -18; L. 1995, c. 426 (Act) and its application in practice. The three cases before us involve Englewood in Bergen County, Clifton in Passaic County, and Franklin Township in Somerset County. We find none of the challenges advanced by appellant districts persuasive. We affirm the State Board of Education in each case.

II
A. The Englewood Appeal (A-4697-97T1)
In August 1997 the proposed charter school, Englewood on the Palisades (Palisades), filed an application for approval, for the 1998-99 school year, with the New Jersey Department of Education (Department). By resolution of October 9, 1997 the Englewood City Board of Education (Englewood) adopted a resolution opposing the application on the grounds that the charter school would divert scarce funds from the existing school district and the application did not meet the goals of the statute creating charter schools.
The application was evaluated by three "reviewers" for the Department, each of whom cited various deficiencies in the application. The Evaluation Tally, a summary of the reviewers' ratings, rated the financial plan as "inadequate" and the implementation plan as lacking sufficient evidence.
On October 29, 1997 the Department issued to the charter school two Review Feedback forms identifying the deficiencies and requiring Palisades to provide additional information. In response to the Department's concerns, Palisades submitted two addenda to its application, one in November 1997 and one in December 1997.
By letter of January 21, 1998 the Commissioner of Education granted contingent approval of the charter application. The Commissioner listed eleven sets of documents that Palisades had to file by stated deadlines, which documents were required by the regulations implementing the statute. When those deadlines were met, the Commissioner advised the charter would be granted unconditionally. There is no indication in the record whether the mandated documents were filed.
Englewood appealed the approval to the State Board of Education, as permitted by N.J.S.A. 18A:36A-4d. Englewood contended in part that the charter school would result in racial imbalance in the district as a whole, as Caucasian students would gravitate toward Palisades.
On April 3, 1998 the State Board upheld the Commissioner's decision, with this caveat:
We find that the Board has not shown that the substance of the application is such that we should set aside the Commissioner's determination that the proposed charter school may continue the process which would allow it to become operative if the Commissioner grants it final approval. Moreover, the Board's arguments with regard to racial impact are speculative at this point in the absence of actual enrollment data. However, given the racial composition of Englewood's student population, *21 the Commissioner should review the racial composition of the student population of the proposed Englewood on the Palisades Charter School before granting final approval.
There is no indication in the record that the Commissioner ever reviewed the racial consequences or issued the "final approval" contemplated by the State Board.
Englewood filed a timely notice of appeal to this court from the State Board's April 3, 1998 adverse decision. It unsuccessfully moved for a stay from both the State Board and this court but we did grant its motion for acceleration. Palisades began operating in September 1998 at the kindergarten level.
B. The Clifton Appeal (A-4825-97T1)
In August 1997 the proposed charter school, Classical Academy Charter School of Clifton (Classical Academy), filed an application for approval, for the 1998-99 school year, with the Department. The Clifton Board of Education (Clifton) sent the Commissioner of Education a letter of opposition, arguing that the proposed school would offer only programs currently offered in the existing schools and that the application was defective.
The application was evaluated by three "reviewers" for the Department, each of whom cited various deficiencies in the application. The Evaluation Tally rated the implementation plan as "strong" to "adequate," and the financial plan as lacking sufficient evidence. On October 29, 1997 the Department issued to Classical Academy two Review Feedback forms identifying various deficiencies and requiring further information. On November 4, 1997 Classical Academy submitted addenda to its application which purported to answer the Department's concerns. By letter of January 21, 1998 the Commissioner granted contingent approval of the application, in language similar to that used in approving the application in the Englewood case.
On appeal by Clifton to the State Board, on April 3, 1998 the State Board upheld the Commissioner's preliminary approval:
We find that the Board has not shown that the substance of the Classical Academy Charter School's application is such that we should set aside the Commissioner's determination that the proposed charter school may continue the process which would allow it to become operative if the Commissioner grants it final approval. We therefore decline to set aside that approval.
Clifton filed a timely notice of appeal to this court. The State Board denied Clifton's motion for a stay. We denied Clifton's attorney's motion to intervene as an individual taxpayer of the City of Clifton. The school began operating in September 1998. In its brief on appeal, the State Board represents that Clifton filed an unsuccessful complaint with the Council on Local Mandates seeking a declaration that the funds it would have to provide for the charter school were violative of the statutory prohibition against "unfunded mandates." See N.J.S.A. 52:13H-1 to -20.
C. The Franklin Township Appeal (A-4973-97T1)
In August 1997 the proposed charter school, Franklin Charter School (Franklin Charter) filed an application for approval for the 1999-2000 school year. The Franklin Township Board of Education (Franklin Township) sent to the Commissioner of Education a letter asserting twenty-five points of opposition.
The application was evaluated by three reviewers, each of whom cited various deficiencies. The Evaluation Tally rated the implementation plan as "adequate" and the financial plan as "inadequate." On October 29, 1997 the Department issued to the proposed school two Review Feedback forms identifying deficiencies and requesting more information. On November 5, 1997 Franklin Charter submitted addenda to its application, in which it purported to answer the Department's concerns. By letter of January 21, 1998 the Commissioner granted contingent approval, which approval would be made final once Franklin Charter filed requested documentation.
On appeal to the State Board, on April 3, 1998 the State Board upheld the Commissioner's *22 contingent approval. It reasoned as follows:
We find that the board has not shown that the substance of the application is such that we should set aside the Commissioner's determination that the proposed charter school may continue the process which would allow it to become operative if the Commissioner grants it final approval.
Franklin Township then filed a timely notice of appeal to this court. Franklin Charter is not yet operational.

III
All three appellants argue that the charter-school applications by the three respondents failed to meet the informational requirements of the Act or regulations. Before we address appellants' arguments, we will review the pertinent provisions of the Act and its accompanying regulations.
A. The Charter School Movement
Authorized in at least thirty states, "charter schools are among the hottest reform initiatives in public education today." Kevin S. Huffman, Note, Charter Schools, Equal Protection Litigation, and the New School Reform Movement, 73 N.Y.U. L.Rev. 1290, 1291-92 (1998). A charter is a type of contractual agreement with the state in which the charter school is freed from most state regulations in return for its commitment to heightened standards of accountability. Jennifer T. Wall, The Establishment of Charter Schools: A Guide to Legal Issues for Legislatures, 1998 B.Y.U. Educ. & L.J. 69 (1998).
The courts of at least three states have considered and rejected various constitutional challenges to charter-school legislation: Villanueva v. Carere, 85 F.3d 481 (10th Cir. 1996) (charter school act did not create suspect class based on ethnicity); Shelby School v. Arizona State Board of Education, 192 Ariz. 156, 962 P.2d 230 (App.1998) (charter school had no due process entitlement to a charter); Council of Organizations v. Governor, 455 Mich. 557, 566 N.W.2d 208 (1997) (charter school act was not violative of the Michigan constitution). In New Jersey the only reported state-court decision is Jersey City Education Association v. City of Jersey City, 316 N.J.Super. 245, 720 A.2d 356 (App. Div.1998), interpreting one section of the act, N.J.S.A. 18A:36A-10, use of public funds to construct a charter school, in a context not pertinent here. In Porta v. Klagholz, 19 F.Supp.2d 290 (D.N.J.1998), the Federal District Court upheld the Act against an Establishment Clause challenge, an issue not presented by these three appeals.
B. The Charter School Program Act of 1995, N.J.S.A. 18A:36A-1 to -18
The desirability of a charter school law in New Jersey was the subject of three public hearings in 1995 before the Senate and Assembly Education Committees. The most frequently expressed objection was charter schools would divert tax dollars from existing districts without any corresponding decrease in their costs. Also articulated was the fear that charter schools would drain away "the best and the brightest" and ultimately lead to elitism and segregation.
In its Fiscal Estimate the Office of Legislative Services perceived "little or no additional costs to the State or to local school districts as a result of this bill":
The charter school would receive the local levy budget per pupil (State aid plus local tax levy) for each pupil attending the charter school, plus any categorical aid or federal funds attributable to that pupil. If out of district pupils were admitted, the district of residence would pay the costs for that pupil. Further, the bill specifies that a charter school may not use public funds for the construction of facilities.

[See Legislative Fiscal Estimate to S. 1796 (1995).]
The Act was adopted effective January 11, 1996. L. 1995, c. 426, § 1. In the Act the Legislature describes the aim of the charter-school concept:
The Legislature finds and declares that the establishment of charter schools as part of this State's program of public education can assist in promoting comprehensive educational reform by providing a mechanism for the implementation of a variety of educational approaches which may not be available in the traditional *23 public school classroom. Specifically, charter schools offer the potential to improve pupil learning; increase for students and parents the educational choices available when selecting the learning environment which they feel may be the most appropriate; encourage the use of different and innovative learning methods; establish a new form of accountability for schools; require the measurement of learning outcomes; make the school the unit for educational improvement; and establish new professional opportunities for teachers.
The Legislature further finds that the establishment of a charter school program is in the best interest of the students of this State and it is therefore the public policy of the State to encourage and facilitate the development of charter schools.

[N.J.S.A. 18A:36A-2.]
The Act empowers the Commissioner of Education to approve and grant charters; once a charter is granted the charter school operates "independently of a local board of education and is managed by a board of trustees," the members of which are "deemed to be public agents authorized by the State Board of Education to supervise and control the charter school." N.J.S.A. 18A:36A-3a. The Act limits to 135 the number of charter schools that may be approved in the first four years of the program; a minimum of three charter schools are allocated to each county. N.J.S.A. 18A:36A-3b. At oral argument, counsel advised us that about thirty charter schools are operational and about fifty total have been approved.
Charter schools may be established by combinations of parents, teaching staff members, institutions of higher education, or private entities. N.J.S.A. 18A:36A-4a. Applications must be submitted to the local board and the Commissioner of Education; the local board submits its recommended action to the Commissioner, who "shall have final authority to grant or reject a charter application." N.J.S.A. 18A:36A-4c. Either the applicant or the local board may appeal the Commissioner's decision to the State Board of Education, which must render a decision within thirty days, failing which the Commissioner's decision becomes final. N.J.S.A. 18A:36A-4d.
The section central to this issue is N.J.S.A. 18A:36A-5, which lists the information that a charter-school application "shall include":
a. The identification of the charter applicant;
b. The name of the proposed charter school;
c. The proposed governance structure of the charter school including a list of the proposed members of the board of trustees of the charter school or a description of the qualifications and method for the appointment or election of members of the board of trustees;
d. The educational goals of the charter school, the curriculum to be offered, and the methods of assessing whether students are meeting educational goals. Charter school students shall be required to meet the same testing and academic performance standards as established by law and regulation for public school students. Charter school students shall also meet any additional assessment indicators which are included within the charter approved by the commissioner;
e. The admission policy and criteria for evaluating the admission of students which shall comply with the requirements of section 8 of this act;
f. The age or grade range of students to be enrolled;
g. The school calendar and school day schedule;
h. A description of the charter school staff responsibilities and the proposed qualifications of teaching staff;
i. A description of the procedures to be implemented to ensure significant parental involvement in the operation of the school;
j. A description of, and address for, the physical facility in which the charter school will be located;
k. Information on the manner in which community groups will be involved in the charter school planning process;
l. The financial plan for the charter school and the provisions which will be *24 made for auditing the school pursuant to the provisions of N.J.S. 18A:23-1;
m. A description of and justification for any waivers of regulations which the charter school will request; and
n. Such other information as the commissioner may require.
A charter school is invested with all the powers of a "body corporate," including the powers to sue and be sued, acquire private property, make contracts and leases, incur debt, and solicit gifts and grants. N.J.S.A. 18A:36A-6. The school's board of trustees "shall have the authority to decide matters related to the operations of the school including budgeting, curriculum, and operating procedures, subject to the school's charter." N.J.S.A. 18A:36A-14a.
In its admission criteria, a charter school must give preference to students living in the public school district in which the school is located; if there are more applications than spaces available, the school must use a "random selection process." N.J.S.A. 18A:36A-8a. Non-resident students may be admitted if space is available. N.J.S.A. 18A:36A-8d. The school's admission policy, to the extent practicable, must "seek the enrollment of a cross section of the community's school age population including racial and academic factors." N.J.S.A. 18A:36A-8e. Enrollment may not exceed the lesser of 500 students or 25% of the student body of the existing district. N.J.S.A. 18A:36A-4e.
A charter school may be located in an existing public school building, in any other public building or work site, "or any other suitable location"; the facility itself is exempt from regulations governing public schools, "except those pertaining to the health or safety of the pupils." N.J.S.A. 18A:36A-10. A charter-school building may not be built with public funds. N.J.S.A. 18A:36A-10.
In its operations the charter school is bound by the laws and regulations governing public schools, unless it requests and is granted exemption. No exemption may be granted from strictures "pertaining to assessment, testing, civil rights and student health and safety." N.J.S.A. 18A:36A-11.
Funding of the charter schools comes mainly (90%) from the existing school district:
The school district of residence shall pay directly to the charter school for each student enrolled in the charter school who resides in the district a presumptive amount equal to 90% of the local levy budget per pupil for the specific grade level in the district. At the discretion of the commissioner and at the time the charter is granted, the commissioner may require the school district of residence to pay directly to the charter school for each student enrolled in the charter school an amount equal to less than 90% percent, or an amount which shall not exceed 100% of the local levy budget per pupil for the specific grade level in the district of residence. The per pupil amount paid to the charter school shall not exceed the local levy budget per pupil for the specific grade level in the district in which the charter school is located. The district of residence shall also pay directly to the charter school any categorical aid attributable to the student, provided the student is receiving appropriate categorical services, and any federal funds attributable to the student.

[N.J.S.A. 18A:36A-12.]
The existing district also must pay for the transportation of charter-school students, on the same terms as that provided to regular students. N.J.S.A. 18A:36A-13.
Any individual or group may file a complaint with the board of trustees alleging a violation of the Act; should the board fail to resolve the complaint satisfactorily, the complainant may ask the Commissioner of Education to investigate and respond. N.J.S.A. 18A:36A-15. The Commissioner is to conduct an annual assessment of each charter school, and must hold public hearings in 2001 concerning the effectiveness and continuation of the program. N.J.S.A. 18A:36A-16. Each charter has an initial duration of four years, subject to renewal for five years. The Commissioner may revoke a charter at any time or may place a school "on probationary status to allow the implementation of a remedial plan." N.J.S.A. 18A:36A-17.
*25 C. The regulations
Under the authority of N.J.S.A. 18A:36A-18, on August 4, 1997, the State Board adopted regulations governing charter schools. N.J.A.C. 6A:11-1.1 to -7.3. As pertinent to these appeals, the regulations promulgate procedures for the application process. They add nine items to the statutory list of information which must be disclosed by the application. N.J.A.C. 6A:11-2.1(b). They also detail the evaluation process that the Department of Education must pursue. N.J.A.C. 6A:11-2.1(c),(d),(e). Applications must be submitted by August 15 of the year preceding the planned start of the school, N.J.A.C. 6A:11-2.1(b)3, and the Commissioner must approve or deny the application by the following January 15. N.J.A.C. 6A:11-2.1(f).
The regulations clearly contemplate the type of contingent approvals that the Commissioner granted in these cases:
(g) The Commissioner may approve an application for a charter which shall be effective when all necessary documents and information are received and approved by the Commissioner. The charter school shall submit at a later date documentation not available at the time of the application submission including but not limited to:
1. Bylaws of the board of trustees;
2. Certificate of incorporation;
3. Identification of its facility and lease, mortgage or title to its facility;
4. Certificate of occupancy issued by the local municipal enforcing official;
5. Sanitary inspection report; and
6. Fire inspection certificate.
(h) All statutorily required documentation shall be submitted to the Department of Education by May 15. The final granting of the charter by the Commissioner shall be effective when all required documentation as listed in (g) above is submitted and approved by the Department of Education.

[N.J.A.C. 6A:11-2.1(g) & (h).]
D. Analysis of the parties' presentations
In this discussion we address the merits of the three appellants' claims that the applications failed to meet the requirements of the Act.
There is an additional consideration pertinent to Englewood's and Clifton's application claims. These two applications were for the 1998-99 school year; as those two appellants were unable to obtain a stay of the charter grants, the two schools have opened. By the time we were able to decide these appeals, the schools began operating. Thus the interests of the current charter-school students, as well as the public policy favoring the charter-school movement, have bearing on whether to void the charter grants for technical deficiencies in the applications.
A more efficacious and practical remedy at this stage may be for appellants to monitor the actual, as opposed to promised, performance of the two schools, and then to invoke the tools provided by the Act to insure compliance, namely, the Commissioner's power to revoke or to impose a remedial plan. N.J.S.A. 18A:36A-17. Where the schools have established a record of performance, it will be possible to judge whether they satisfy the Act's various mandates, rather than having to engage in the more uncertain task of assessing whether the plans were sufficient on paper. Franklin Township perhaps stands on a different footing because the charter school in that district will not open until the 1999-2000 school year.
1. Englewood board of education
The Englewood board identifies numerous ways in which Palisades' application did not meet the prerequisites of the Act.
a. N.J.S.A. 18A:36A-4a
This section, relating to the kinds of persons who may establish a charter school, states in pertinent part:
a. A charter school may be established by teaching staff members, parents with children attending the schools of the district, or a combination of teaching staff members and parents. A charter school may also be established by an institution of higher education or a private entity located within the State in conjunction with teaching staff *26 members and parents of children attending the schools of the district.
Englewood complains, as it did in its appeal to the State Board, that the application did not list any teaching staff members among the founders of the charter school, and that it listed only one parent who had a child in the school district. Apparently Englewood construes N.J.S.A. 18A:36A-4a to require the founders to include more than one parent with a child attending school in the district.
The application listed thirteen "founders," comprising twelve individuals and one charitable foundation. Five were identified as "teaching staff members," two were from a New York district and three were from Englewood; the latter were labelled consultants and according to Englewood were not "teaching staff members." Only one of the parents had a child attending school in the Englewood district.
Palisades counters that the Act does not require that the founders include more than one parent with a child in the district. Nor does the Act require that the "teaching staff members" work in the district at the time of the application. Thus, reasons Palisades, the inclusion of two teachers from a New York district satisfied the Act's conditions; the application described a permissible combination of founders: teaching staff members, a parent with a child in the district, and other parents.
The State Board cites legislative history to support the view that "parents" need not have children in the district to qualify as founders. An earlier Assembly version of the bill which became the Act defined the categories of founders as follows:
4.a. A charter school may be established by ten or more teaching staff members, ten parents with children attending the schools of the district, or a group of five teaching staff members and five parents with children attending the schools of the district. A charter school may also be established by an institution of higher education located within the State in conjunction with five teaching staff members and five parents of children attending the schools of the district.
[Assembly Committee Substitute for Assembly Bill No. 592, adopted April 27, 1995.]
But the Senate Committee substitute changed the text, in pertinent part, to the following:
4.a. A charter school may be established by teaching staff members, parents with children attending the schools of the district, or a combination of teaching staff members and parents. A charter school may also be established by an institution of higher education or a private entity located within the State in conjunction with teaching staff members and parents of children attending the schools of the district.
[Senate Committee Substitute for Assembly Bill No. 592, adopted December 11, 1995.]
That is the version enacted into law.
From this history the State reasons:
Plainly, the Legislature elected to delete the requirement that the founding parents must have children attending the schools in the district; the only legislative prerequisite is that the founders be parents. This interpretation is buttressed by the second option found in N.J.S.A. 18A:36A-4a for establishing a [charter] school, which is by an institution of higher learning or a private entity "in conjunction with teaching staff members and parents of children attending the schools of the district." It is evident from the Legislature's choice of terms that it specified the circumstances in which the founders must have children attending school within the district; it deliberately removed that requirement when the charter school is founded by a combination of teaching staff members and parents.
Reading the plain language of N.J.S.A. 18A:36A-4a, we agree with Palisades. There is nothing which demands that there be more than one parent from the district. The statute is silent as to how many founders there must be of each category, a silence which takes on enhanced meaning where the Legislature dispensed with the numerical limitations contained in the earlier version. When a legislature includes limiting *27 language in an earlier version of a bill but omits it from the final version, we may presume, absent contrary indicia, that no limitation was intended. United States ex rel. Stinson v. Prudential Ins., 944 F.2d 1149, 1156 (3d Cir.1991). See also Cedar Cove, Inc. v. Stanzione, 122 N.J. 202, 211, 584 A.2d 784 (1991) (statutory antecedents are instructive as to the meaning of the final enactment). Moreover, neither the Act nor the regulations define "teaching staff member." Thus there is no statutory impediment to any teaching staff members from out-of-state, nor to New Jersey teachers utilized as consultants.
In any event, in interpreting a new statute, a reviewing court must accord substantial deference to the interpretation by the agency charged with implementing it. Waste Management v. State, DEPE, 278 N.J.Super. 56, 64, 650 A.2d 379 (App.Div. 1994). Such deference has been extended to the Commissioner's regulatory decisions implicating the quality and efficiency of education in New Jersey. Dennery v. Board of Educ., 131 N.J. 626, 637, 641-43, 622 A.2d 858 (1993). Thus, "the Court has repeatedly acknowledged and approved the administrative handling of educational controversies that arise in the context of constitutional and statutory litigation, including evaluation of local educational problems, design of remedial measures, and supervision of the program implementation." Abbott v. Burke, 100 N.J. 269, 300, 495 A.2d 376 (1985). Since the State Board's reading of this section of the Act is consistent with its terms, we defer to its interpretation.
b. N.J.S.A. 18A:36A-5c
This section mandates that the application set forth "[t]he proposed governance structure of the charter school including a list of the proposed members of the board of trustees of the charter school or a description of the qualifications and method for the apportionment or election of members of the board of trustees."
The application did not list names of proposed board members, instead stating that "[i]nformation on each member of the Board of Trustees will be provided as an addendum to this application." The application then listed the expected qualifications of the board members. It also stipulated the method of selection of board members. Neither of the addenda to the application provided information about individual board members.
Englewood argues that the application violated this section because it did not provide the names of the proposed members of the board of trustees, let alone their qualifications. Palisades counters that the section permits alternative submissions  either the names of the board members or "a description of the qualifications and method for the appointment or election of members of the board of trustees." As the application supplied the second alternative form of information, Palisades argues, it complied with the Act.
The plain text of the section supports Palisades' position. Had the Legislature intended that a list of names be mandatory, it would not have permitted a disjunctive option. The statement of general qualifications was sufficient.
c. N.J.S.A. 18A:36A-5j
This section demands that the application provide "[a] description of, and address for, the physical facility in which the charter school will be located." The application stated that there was "no facility as yet," and that a facility committee was investigating various sites, including three which it named. Neither of the addenda identified a chosen site.
Englewood argues that identification of a facility is essential to a proper evaluation of a charter-school application: "A physical facility is of substantial importance and its absence makes it impossible to assess the sufficiency of the financial plan." It relies on the State Board's decision in a 1997 charter-school case, In the Matter of the Grant of the Charter School Application of the Red Bank Charter School Association, SB # 20-97 (St. Bd. of Educ.1997), in which the State Board held that an application violated various statutory standards, the "most glaring" of which was the failure to identify a facility:

*28 Without such information, it is impossible to assess with any confidence the sufficiency of the Charter School's financial plan, which in this case had anticipated obtaining a building and mortgage in the amounts of $375,000 and $400,000 respectively. Those amounts were thereafter reduced to $0 in addenda submitted by the Charter School subsequent to its `Final Application' without any explanation or specifications as to a revised plan. As previously noted, a Department reviewer raised `concerns' regarding this modification and `assumed' that the Charter School had budgeted $93,750 for rental of land and building in its place. This problem is underscored by the fact that the Charter School's own `Timetable' included with its addenda indicates its intention to secure a facility `through lease or sale.' (Emphasis added.) Nor can it be determined without a description and address for the facility whether the school would be situated in a `suitable location', as required by N.J.S.A. 18A:36A-10.

[Red Bank Charter School, at 9-10.]
Palisades answers that it was a practical impossibility for it to identify a facility at the time of its application: "At that point in time, the founders had no idea whether their proposed school would receive a charter from the Commissioner and thus whether it would in fact be able to open for the 1998-1999 school year." Moreover, Palisades reasons, until the charter was approved, it "had no access to the state and federal funding that would allow it to commit to lease or purchase school facilities or to pay staff salaries."
Palisades points out that the regulations acknowledge these practicalities, in that they contemplate conditional approval of an application, subject to the applicant's submitting data not available at the time of application, including the identification of the facility (citing N.J.A.C. 6A:11-2.1(g) & (h)). The State Board's succinct response reiterates Palisades' point that the information about the facility could not be obtained until after initial approval.
The statute, on its face, leaves no room for the kind of delayed submissions allowed by the regulations. It states in pertinent part that a charter school application "shall" include the enumerated information, including "[a] description of, and address for, the physical facility in which the charter school will be located." N.J.S.A. 18A:36A-5j. This requirement may indeed be difficult to meet at the early stage of the initial application; nonetheless, the Legislature chose to impose it. Hence the State Board, via its regulations, had no power to relax that requirement, even if in the interest of administrative convenience. Smith v. Director, Div. of Taxation, 108 N.J. 19, 33, 527 A.2d 843 (1987) ("administrative convenience cannot support a regulation that conflicts with the governing statute"). But the defect in the initial application was probably inconsequential as a cognizable issue on appeal; obviously, at some point after the application was filed and before the school opened in September 1998, a site was selected and became operational. Hence we conclude this objection is moot.
d. N.J.S.A. 18A:36A-5g
This section requires that the application disclose "[t]he school calendar and school day schedule." The application stated the charter school would follow the regular school district's calendar; it also declared its intended opening and ending dates, and it set forth the times at which the school day would begin and end.
Englewood argues that the incorporation of the regular district's calendar "demonstrates no initiative" or innovation, which is the underlying goal of charter schools. And it complains that the application mentions extra programs that are dependent on fees for funding.
Palisades counters that the Commissioner reasonably concluded the application satisfied N.J.S.A. 18A:36A-5g because "nothing in the Act or the Regulations requires innovation in every aspect of charter school life." The State Board tersely disposes of this point by calling it "frivolous."
We conclude that the application amply satisfied the statute's mandate; the calendar and schedule need not meet some standard of *29 innovation or fiscal integrity but only need be included in the application.
e. N.J.S.A. 18A:36A-5h
Under this section, the application must describe "the charter school staff responsibilities and the proposed qualifications of teaching staff." On this topic the application included over four pages setting forth the qualities expected of all professional staff and the responsibilities of the director and the teachers.
Englewood claims that this treatment was insufficient because "[t]here are no names or credentials of any of the proposed teachers or support staff provided." It also claims that the initial reviews of the application cited deficiencies in standards for performance evaluation and in information about the chain of command. Palisades responds that it would be a practical impossibility for an applicant to name its faculty before the school was approved. The State Board makes a similar argument.
Englewood misreads the statute, which does not demand the names and qualifications of actual teaching staff. As Palisades points out, such a list would not be possible at the application stage. The statute requires only that the staff's responsibilities and proposed qualifications be described, which is what the application did.
f. N.J.S.A. 18A:36A-5e
This section decrees that the application set forth "[t]he admission policy and criteria for evaluating the admission of students[,] which shall comply with the requirements of section 8 of this act." "Section 8" is N.J.S.A. 18A:36A-8, which creates an admissions preference for students who live in the district and for siblings of those already enrolled; it also declares that the admission policy should aim to reflect a cross-section of the community.
In an eight-page section of the application, Palisades reviewed the expected enrollment through 2006, detailed application procedures and criteria, declared the intent not to discriminate on any basis, and described its plans for attracting a cross-section of the community.
Englewood focuses on the final topic:
There is no indication how or if any action to outreach will target sufficiently to enroll a cross section of the community. The public school district is attempting to address a racial imbalance in the public schools, presently 68% Afro-American and 30% Hispanic. It is not clear that the Charter School's admission policy has sufficient outreach to enroll a cross section and that it would not impact negatively upon the attempts to address the imbalance problem.
Englewood also represents that "the students entering the charter school from the public school represent a more economically advantaged population than the schools from which they are leaving."
The State Board does not specifically address this point. Palisades accurately counters that "the application in fact describes in detail recruitment efforts calculated to ensure a diverse student body." The application stated that the recruitment committee would advertise the school via television, radio, flyers "in strategic places," and visits to churches, social service agencies, housing complexeswherever the committee deemed "necessary to reach a true cross section of the population," including taking racial factors into account. Englewood does not suggest what more the application could have said. We defer to the Commissioner's implied judgment that N.J.S.A. 18A:36A-5e was satisfied by the statement provided in the application.
g. N.J.S.A. 18A:36A-5d
This section requires that an applicant set forth "[t]he educational goals of the charter school, the curriculum to be offered, and the methods of assessing whether students are meeting educational goals." The application included lengthy sections on mission and goals on curriculum, on student assessment, and on meeting the needs of at-risk students.
Englewood argues that "[m]uch of the application relies upon generalized phrases *30 without concrete meaning or specific details to describe goals and curriculum." While Englewood cites to five pages of the application, it does not point to specific language which it deems too general to satisfy the Act. Englewood does say that the initial reviewers found some deficiencies in describing professional development and training, the process of developing assessment standards, counseling, methods for meeting the needs of at-risk students, and the process of self-evaluation and accountability.
Palisades responds that Englewood's protests are belied by "the contents of the application itself" and accurately summarizes the key contents. The State Board argues that this court should defer to the Commissioner's expertise in approving "the educational component of the application." We agree upon a reading of this extensive part of the application the Commissioner reasonably concluded the application satisfied the statutory requirement.
h. N.J.S.A. 18A:36A-5(l)
This section requires that the application provide "[t]he financial plan for the charter school and the provisions which will be made for auditing the school pursuant to the provisions of N.J.S. 18A:23-1." In this case the application included as its Section II a thirty-page Financial Plan. In addition, the first addendum submitted a completely revised plan. The plan was revised again by the second addendum.
Englewood stresses that one reviewer rated the financial plan as inadequate and listed twenty (we count nineteen) specific deficiencies. Englewood also cites the Final Review Feedback, which listed thirteen problems remaining with the financial plan. On appeal Englewood focuses on two problems it deems fatal to the application. First, it says that "[t]he absence of a physical site and the vague provisions for financing a site through future fundraising does not allow for a reasonable analysis of the financial plan." Second, it claims that the charter school "will have a clear and negative financial impact on the Englewood School District, which is already struggling with tight fiscal constraints." Again it relies on the State Board's decision in Red Bank Charter School, in which the State Board cautioned that the beneficial impact of a charter school must be weighed against the adverse effects on the existing district.
Palisades argues that its financial plan, with its revisions, was sufficient, stating that it included "a line-by-line narrative explaining each entry." With respect to financing a facility, Palisades observes that in its revised financial plan it explained the calculation of its estimated cost of renting a facility.
Palisades distinguishes Red Bank Charter School on the ground that there the charter school had submitted a plan which allocated no money at all to facility costs. The State Board distinguishes Red Bank Charter School on the ground it is no longer controlling because the State Board itself impliedly overruled it in deciding "the 1998 charter school appeals" (these three cases plus the other seven pending before us).
The current position of the State Board apparently is that the effect of a proposed charter school on the existing district is not relevant to the decision whether to approve an application. Englewood finds no solace in the earlier Red Bank decision as binding precedent. Nothing in the legislation commands the Commissioner to consider, as a criterion for approval, the fiscal impact that the charter school will have on the existing district. Whether that was a wise or fair omission is not for this court to say, except as it might implicate constitutional restrictions which we address later.
The Commissioner and State Board were better suited than this court to evaluate the adequacy of the planned financing for the physical site. Should financing prove inadequate, the Act provides certain remedies, as discussed above.
i. N.J.S.A. 18A:36A-2
Englewood contends the application failed to establish that the charter school will provide the kind of innovation and improved learning environment the Legislature intended. It points to the legislative declaration in N.J.S.A. 18A:36A-2 and contends the proposed school has not shown it will meet the *31 stated goals or that its services will be superior or different from those offered by the existing district. When the lack of benefit is juxtaposed with the likely financial harm to the existing district, Englewood contends, the State Board was compelled to reject the application.
Palisades counters that the application did indeed promise the requisite innovation:
In furtherance of the statute's purposes, the Englewood on the Palisades charter application proposes the creation of a school featuring small class sizes, Individual Learning and Growth Plans, and student performance portfolios. Ra2, Ra6. The school's program includes the education concepts advanced in Linda Darling-Hammond's The Right to Learn, see Ra10; Ra12; Ra18; Ra25; Ra27; Ra29; the encouragement of initiative by members of the teaching staff, Ra65-Ra66; and the extensive use of parental resources. Ra125; Ra135; Aa119. As a result, the Commissioner's January 21, 1998 letter approving the Englewood on the Palisades charter cites its "innovative school mission."
With respect to Englewood's complaint about the financial harm to the present district, Palisades states that Englewood provided no substantiation to the State Board of its claim that the diversion of funds from the district to the charter school "would adversely impact the education of its non-charter school students." The State Board's answer is that the Act does not compel the Commissioner to consider the consequences to the existing district, or "to compare the proposed charter school program to the program offered by the district of residence."
The question of whether an educational program achieves the goals of the education laws is uniquely committed to the Commissioner and State Board, the executive arms to which the Legislature has entrusted those judgments. Abbott, 100 N.J. at 300, 495 A.2d 376. As Palisades observes, on its face the application did purport to describe ways in which the charter school would provide a non-traditional educational setting. For example, the application promised classes no larger than fifteen students, individual learning plans and use of the theory of "authentic pedagogy," which was described in detail. The application elaborated nine goals, which it explained in detail, complete with citations to texts and experts in the field. Whether those goals were realistic and responsive to the Legislature's intent in authorizing charter schools is best answered by the Commissioner and the State Board. Absent any clear indication, other than Englewood's own self-serving and conclusory statements, that those goals were illusory, we defer to their judgment.
2. Clifton board of education
The Clifton board identifies several ways that the charter school application from Classical Academy fell short of the Act's requirements. As discussed earlier, purely technical defects in this application do not justify overturning the charter at this late date, when the school is "up and running."
a. Core Curriculum Content Standards
Clifton asserts, without dispute, that charter schools are subject to the "thorough and efficient" education mandate of N.J. Const. art. VIII, § 4. In 1996 the Legislature empowered the Commissioner of Education to develop core curriculum standards which must be met in order to satisfy this constitutional requirement. N.J.S.A. 18A:7F-4 (part of the Comprehensive Educational Improvement and Financing Act of 1996, N.J.S.A. 18A:7F-1 to -34). By regulation, charter schools are required to meet these standards. N.J.A.C. 6A:11-2.2(a)1iii.
In May 1996 the State Board adopted the mandated standards. Abbott v. Burke, 149 N.J. 145, 161, 693 A.2d 417 (1997). On this appeal, Clifton has supplied only a portion of the Introduction to these standards. That excerpt, however, is sufficient to allow us to resolve Clifton's claim.
Clifton complains that the application filed by Classical Academy omitted two of the seven academic-content areas required by the standards. Those seven areas, as listed in the Introduction to the standards, include Visual and Performing Arts, Comprehensive Health and Physical Education, *32 Language Arts/Literacy, Mathematics, Science, Social Studies, and World Languages. Clifton argues that the application did not represent that Classical Academy would be teaching the first two areasVisual and Performing Arts and Comprehensive Health and Physical Education"as separate, discrete, academic courses." Rather, claims Clifton, Classical Academy intends to "integrate" those two subject areas into the academic curriculum as a whole. Clifton's premise is that the standards forbid such integration, demanding instead that they be taught as separate courses. In its reply brief Clifton retreats a bit from this position, conceding that the standards do not compel "formal courses in each of the seven discrete academic content areas." But Clifton insists that none of the seven areas may be integrated into the others:
It is true (as the Classical Academy argues) that schools are free to choose the exact mechanisms by which students are to achieve the results mandated under those Core Curriculum Content Standards and, indeed, formal courses in each of the seven discrete academic content areas are not required. This is not to say, however, that the standards permit integration of any of the separate academic areas. The standards provide that the seven areas can be "... reinforced through experiences beyond the school walls, such as volunteer activities, job shadowing, and part time jobs." (Appellant's Appendix "Aa", at pg. 69). Integration of two of the seven discrete separate academic areas into other courses of study, however, directly contradicts the express language of those standards.
The Introduction to the standards explains that while the fifty-six standards had been organized into the seven academic areas, "this is not meant to imply that each standard can be met only through courses in a formal school setting. The application of knowledge from all content areas can be reinforced through experiences beyond the school walls, such as volunteer activities, job shadowing, and part-time jobs." The Introduction contemplates that other content areas  such as the humanities, consumer science, technology, business, and career education  would be integrated into the seven listed core areas.
The Introduction delegates discretion in the local boards as to how the standards are to be implemented:
These standards are not meant to serve as a statewide curriculum guide. They define the results expected but do not limit district strategies for how to ensure that their students achieve these expectations. To assist local educators, the standards will be further elaborated through curriculum frameworks. While also not a curriculum, these frameworks will bring to life the intent of the standards through classroom examples and a discussion of the underlying rationales. Local curriculum developers can use the frameworks as a resource to develop district curricula that best meet the needs of the students in each community. Curriculum frameworks also serve as a resource to classroom teachers and to staff developers who want to modify instruction in light of the new standards.
Classical Academy's application announced that the charter school would have a traditional classical curriculum, consisting of seven major, core subjects: Latin, English, literature, writing and speaking, history, math, and science. With respect to arts, music, and health, the application stated that they would not be offered as regular courses but would "be meaningfully integrated into the Classical Academy's other academic courses." The application offered specific examples of such integration.
In rebuttal of Clifton's argument that the standards do not permit "integration" of the arts and physical education categories, Classical Academy claims (and Clifton concedes in its reply brief) that separate periods devoted strictly to those categories are not required. And it emphasizes the Introduction's recognition that local boards should have the freedom to devise their own strategies for meeting the core curriculum standards.
As a cursory reading of the application's curriculum section shows, it indeed is comprehensive and, at least in its planned structure, appears to aim at the type of innovation *33 intended by the charter school movement. One reviewer rated this part of the application as "exemplary." In the Commissioner's judgment the planned curriculum satisfied the application requirements, and we must defer to him and the State Board, absent any suggestion that the Commissioner's assessment was wholly unsupportable.
b. Other constitutional defects in the application
Clifton also complains that the application falls short of other State Board regulations that define the standards for an education that meets the "thorough and efficient" ("t & e") test of the State Constitution. These are not the charter-school regulations but rather the regulations governing all public schools. N.J.S.A. 18A:36A-11a makes charter schools subject to the regulations governing public schools.
Clifton points to five regulatory areas in which the application was deficient (these regulations have been recodified since Clifton filed its brief; we use the current designations): programs for the gifted and talented (N.J.A.C. 6:8-2.5(a)4); guidance and counseling services (N.J.A.C. 6:8-2.7(a)3); substance abuse programs (N.J.A.C. 6:8-2.7(a)4); evaluations of teaching staff by certified supervisors (N.J.A.C. 6:8-2.8(a)2); and child study teams to implement special education programs (N.J.A.C. 6A:14-1.1 to -10.2).
In the first areagifted and talentedthe "t & e" regulation requires that a public school district "make provisions for identifying pupils with gifted and talented abilities and for providing them with an educational program and services." N.J.A.C. 6:8-2.5(a)4. Classical Academy claims that its application did adequately account for both gifted and special-needs students. It concedes that it does not plan to place students in "tracks" or to classify them by ability. But it claims that this is a strength of its program; the philosophy is to "mainstream" all students. And it cites those parts of the application and addenda which described how the needs of individual students would be identified and addressed.
In its reply brief Clifton argues while Classical Academy has stated its plans with respect to at-risk students, it has not said anything about those "at the opposite end of the education spectrum": gifted and talented. True, the application does not expressly describe programs for gifted and talented. But it does declare the school's intent "to identify areas of strength and weakness for individual students," and to use the information to adjust class size and content "to meet and to solve the identified academic needs of each Classical Academy student." If the school proves unable to meet the needs of the gifted and talented, the aggrieved parents may complain at that time.
Next, the regulation governing guidance and counseling requires that a district "provide all pupils with a board-approved program of guidance and counseling services." N.J.A.C. 6:8-2.7(a)3i. Classical Academy asserts that its application dealt with this topic as follows:
The Classical Academy intends not to have on its professional staff persons such as guidance counselors, child-study team members, psychologists, and others who are commonly paid as teachers but have no classroom or organized instructional duties. Functions normally served by professional support staff, such as guidance counseling, will be assimilated into and allocated amongst classroom teachers. In some circumstances, the Classical Academy will contract for professional support services on an "ad hoc" fee-for-service basis.
There are several important advantages to this policy, among which are a greater allocation of funds for the academic classroom and, since the academic teachers working daily with students know these students best, counseling will be more effective.
Clifton contends that there is nothing in the record, such as a letter from an independent provider, to support Classical Academy's "promise" that it will hire independent contractors to provide guidance and counseling services. And Clifton insists that teachers not certified to provide those services cannot do so effectively.
*34 Classical Academy is correct; the pertinent "t & e" regulation, quoted above, does not expressly mandate that certified counselors be hired. The Commissioner and State Board have impliedly concluded that charter schools can fulfill this "t & e" obligation by using classroom teachers, as supplemented by independent contractors. We defer to that assessment.
The substance-abuse regulation mandates that a district "develop and implement a board-approved substance abuse prevention program for all grades," which must conform to the "substance abuse code" (N.J.A.C. 6:29-6) and meet other criteria (treatment, testing, instruction, cooperation with local law enforcement). N.J.A.C. 6:8-2.7(a)4. Classical Academy admits that "no specific portion" of the application established a substance-abuse program. Nonetheless, it notes that the disciplinary policy calls for the expulsion of students involved in drugs, that the school will contract with outside experts for help with drug problems, and that the health curriculum will educate students about the dangers of drugs. These references provide sufficient support for the State Board's implied finding that the application adequately addressed substance abuse.
Finally, with respect to teacher evaluation, N.J.A.C. 6:8-2.8(a)2 requires that a public-school district observe and evaluate all teaching and administrative staff, and that the observations be performed by certified supervisors. The application described a program of "peer review," as supplemented by outside consultants who would be certified supervisors. The addenda promised a more prominent role for the outside consultants:
The Classical Academy's "peer review" system is, however, not meant to supplement, take the place of, or in any way circumvent the state required "formal" teacher evaluations. These are written and submitted by individuals holding the required state certification (in "supervision/curriculum") necessary to formally observe and produce a written teacher evaluation) based on their observation(s). Classical Academy teachers, of whatever rank, will be so evaluated, and done so by qualified, licensed personnel not affiliated (i.e. outside consultants) with the Classical Academy.
As Classical Academy contends, the application's reliance on certified supervisors as consultants satisfies the "t & e" regulation.
c. The financial plan
Clifton identifies four alleged defects in the financial-plan portion of the application. First, Clifton reasons that the current plan will yield nearly a $33,000 deficit in the first year. This is because the school admitted in a brief below that it had not qualified for a federal grant of $45,000 included in its original budget estimate. As the plan projected a $12,276 surplus with that grant, on rejection the surplus will become almost a $33,000 deficit. Clifton concludes that a plan which will yield a deficit can not be deemed adequate.
Classical Academy responds that the Act requires only that the application include a financial plan. N.J.S.A. 18A:36A-5(l). Neither the Act nor the regulations address the content of that plan. Hence, the school concludes the Commissioner enjoys broad discretion in evaluating a plan's adequacy.
Treating Clifton's specific objections, Classical Academy first observes that the application expressly anticipated not qualifying for federal funds:
Should these sources not be realized we would obtain "start-up" funding from other sources such as local banking institutions. With these "one time" expenses removed from the proposed budget, and the restrained and prudent allocation of financial resources (a restraint and prudence made possible by the unique design of the Classical Academy), we shall be able to operate the Classical Academy within the funds available from the Clifton Board of Education. Should those funds be reduced we can continue to operate by making adjustments to certain discretionary spending categories. We would not reduce or reallocate the funds for instruction.
Clifton's reaction is there is nothing in the record, such as letters from local banks, to support the school's "unsubstantiated promises." *35 We agree with Classical Academy. Absent any more specific guidance in the statute or regulations, we defer to the Commissioner's judgment that the financial plan was adequate.
The second deficiency cited by Clifton is the application did not identify a specific facility for the school, the estimate of the costs for preparing a site was "entirely speculative," and the estimate could not justify a finding that the financial plan was adequate. Clifton relies on the report of its own expert, Glenn Wrigley, an architect, who examined the financial plan and who prepared a report comparing the plan to the real costs of the required improvements. Wrigley summarized his opinion as follows:
Based upon the documentation given to me, and the cursory review of both Title 6 of the Department of Education, and the Building Subcode, I believe that the $40,000 figure offered by the applicant in this Budget Summary is flawed and incomplete. It does not appear to address all the basic facility requirements for Educational Buildings, nor does it appear to address some very basic Building Code requirements for fire separation. Their Budget Summary would appear to assume the most optimistic outcome, which is a long-shot at best, and the actual cost of improvements will likely increase as they and their consultants look closer at any list of available properties.
As for the probable cost of improvements, it is virtually impossible to estimate without a location in mind. If looked upon as an interior renovation project (which is basically what this project entails), our experience has been that clients might expect to spend anywhere from $20.00 to $50.00 per square foot of occupied space (applied mathematically here, that equals between $200,000 and $500,000, not including Design Fees). My opinion of course, like theirs, may be looked upon as a guess. But I am confident that my guess is based upon past experience.
In response, Classical Academy says that its cost estimates were based on consultation with several realtors with the expertise to fairly evaluate the school's plans for the facility. It points out that the regulations allow for approval of an application before a site has been identified. N.J.A.C. 6A:11-2.1(g)3. We consider and uphold the validity of N.J.A.C. 6A:11-2.1(g)(3) as sensible in this context. While experts may differ over the effectiveness of a financial plan, we defer to the Commissioner's presumed expertise in assessing whether this plan met the application requirements.
Third, Clifton complains "there is no budgetary allotment for the evaluation of teachers on a contractual basis as the applicant now promises in its submission before the State Board of Education." Classical Academy disputes Clifton's premise: "Lines 55 and 56 of the budget summary respectively set aside $1,280 for miscellaneous professional consultants and $2,000 for the unclassified professional services." Thus, the school concludes, "the budget includes sufficient funds to pay for such services."
In its reply brief Clifton dismisses the school's response because:
There is nothing in the record indicating that those budget items relate to evaluations for teachers or administrators. Neither is there anything to support the Classical Academy's assertions that $3,280.00 is a reliable estimate of the costs for providing these services, even if one were to assume that they were related to the evaluation function.
At the application stage, a proposed charter school need not precisely prove the reliability of its financial estimates and we defer to the Commissioner's implied judgment that the financial plan was sufficient.
Last, Clifton protests that "[t]he liability insurance quote of approximately $12,000 has no back-up documentation and is clearly unsubstantiated by any `facts' in the record." Classical Academy answers that the actual amount allocated to liability, property and fidelity insurance was $12,750. It also stresses that these insurance estimates were based on its consultations with insurance companies and with its own board members who had experience with commercial insurance. Clifton contends that the school's "vague unsubstantiated and unspecified conversations" *36 do not constitute credible evidence to support the estimates. In preparing its application, a charter school is not held to any conventional standard of proof of the kind governing adjudicatory proceedings. While it must supply the mandated information, it need not prove it, as in court. Indeed, the information is in the nature of a statement of expectations, most of which are incapable of definitive proof.
We find that Clifton has failed to establish any fatal defects in the application.
3. Franklin Township board of education
Franklin Township claims various allegedly fatal defects in the application by the Franklin Charter School.
a. The lack of a facility
As do the other two appellants, Franklin Township complains that the application failed to specify a facility, as required by N.J.S.A. 18A:36A-5j. The Franklin Charter School's application promised that a site would be designated after the charter was granted. The addenda stated that the school's "founding team is in the process of identifying a suitable school site." Franklin Township argues that the Legislature intended that a site designation is a prerequisite to a successful application; otherwise the Act would not have demanded an "address for" the site.
Franklin Charter School does not offer any defense for this omission; rather, it argues generally that we should defer to the Commissioner's approval. The State Board points out that one of the Act's implementing regulations, N.J.A.C. 6A:11-2.1(g)3, does permit a post-application submission of data concerning the facility. The Commissioner's "final" approval is contingent upon a school's filing the outstanding material by the May 15 deadline following approval. N.J.A.C. 6A:11-2.1(h).
Franklin Township correctly argues that, because the Act clearly demands a facility be identified in the initial application, the regulation that appears to relax this demand must be ultra vires. We conclude reliance on the post-application site-designation regulation in this start-up context is harmless, not reversible error for the reasons expressed at IIID(1)(c), and that the applicant substantially complied with the statutory scheme. See Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 239-240, 708 A.2d 401 (1998).
b. Other defects
Franklin Township observes that one of the reviewers of the application found that twenty-five out of the eighty-eight areas evaluated were "inadequate." It adds that the addenda to the application did not cure those inadequacies, and yet the Commissioner approved the charter without accounting for the deficiencies noted by the reviewer. The Franklin Charter School contends that the addenda satisfied all of the deficiencies.
The State Board argues that, regardless of what any individual reviewer found, the Commissioner has been delegated the "final authority to grant or reject a charter application." N.J.S.A. 18A:36A-4c. Hence the Commissioner had no duty to defer to a reviewer. In any event, the State Board observes, the reviewer mentioned by Franklin Township rated the application "adequate" overall (albeit "borderline") and all three reviewers cumulatively rated the implementation portion of the application, the portion attacked by Franklin Township in this issue, as "adequate."
In its reply brief Franklin Township invokes the principle that an agency charged with applying statutory criteria to an application for legislative approval must explain how it evaluated the application according to the requisite criteria. It urges that without such an explanation, we cannot perform our review function, Matter of Bloomingdale Conval. Ctr., 233 N.J.Super. 46, 55, 558 A.2d 19 (App.Div.1989).
In his contingent approval, the Commissioner identified five "strengths" that contributed to his decision:
 Implementation Plan
 well described mission, goals and objectives;
 well described founders and governance;
*37  well described admissions policy; and
 well described educational program.
 Financial Plan
 adequate financial plan.
The State Board summarized Franklin Township's objections and found that the Township had "not shown that the substance of the application is such that we should set aside the Commissioner's determination that the proposed charter school may continue the process which would allow it to become operative if the Commissioner grants it final approval."
When the Commissioner is not acting in a quasi-judicial capacity, as he was not here, he need not provide the kind of formalized findings and conclusions necessary in the traditional contested case. East Windsor Reg'l Bd. of Educ. v. State Board of Educ., 172 N.J.Super. 547, 551-52, 412 A.2d 1320 (App.Div.1980). Accord, In re Physical Abuse at Blackacre Acad., 304 N.J.Super. 168, 188, 698 A.2d 1275 (App.Div.1997). In such cases we do not review under the substantial-credible-evidence standard, but rather under the standard of whether the decision is arbitrary, capricious or unreasonable. Ibid. While this standard does demand that the reasons for the decision be discernible, the reasons need not be as detailed or formalized as an agency adjudication of disputed facts; they need only be inferable from the record considered by the agency. Id. at 188-89, 698 A.2d 1275; East Windsor, 172 N.J.Super. at 552-53, 412 A.2d 1320.
In all three appeals the Commissioner's and State Board's decisions were substantially similar in form, with much common language and with different strengths listed for each situation. The decisions might not have been sufficient if there were disputed fact questions and the agency were acting in an adjudicatory capacity. But it is clear  from the extensive application format, the addenda, and the evaluation documents  that the Department engaged in an extensive review before approving the applications. While the approval decisions could be second-guessed for wisdom or correctness, we cannot say that they were arbitrary or capricious, or that their underlying bases escape our detection. While the Commissioner's and State Board's decisions could have been more expansive, we think they were adequately comprehensive and sufficiently detailed to warrant our deference. These are decisions about educational and social policy, not law.

IV
Franklin Township disputes the Commissioner's authority to grant a "conditional approval" of a charter application. It argues that the two-step process (approval and final granting) allowed by the regulations is not permitted by the statute and hence the process is invalid. Franklin Charter School counters that the two-tiered process is reasonably implied by the Act because it would be impractical for a charter school to supply all required documentation before the final approval. Similarly, the State Board contends that the regulations are consistent with the Act and have the salutary effect of fostering the Act's purpose, to encourage charter schools.
The Act empowers the Commissioner to "establish a charter school program which shall provide for the approval and granting of charters to charter schools pursuant to the provisions of this act." N.J.S.A. 18A:36A-3a (emphasis added). An application must be submitted during the "school year preceding the school year in which the charter school will be established." N.J.S.A. 18A:36A-4c. The Commissioner "shall have the final authority to grant or reject a charter application." N.J.S.A. 18A:36A-4c. The Commissioner's decision is appealable to the State Board. N.J.S.A. 18A:36A-4d.
Focusing on the language of N.J.S.A. 18A:36A-4c"to grant or reject a charter application"Franklin Township reasons that the Act contemplates only one kind of approving action by the Commissioner: a final grant. The Township complains the regulations permit less than final approval by the Commissioner. N.J.A.C. 6A:11-2.1(a) allows the Commissioner to "approve, grant, or deny an application." The definitional section explains and distinguishes between the concepts of approval and grant. "Approval *38 of a charter" is defined as "an endorsement by the Commissioner following the review of an eligible application by the Department of Education and contingent upon the receipt of necessary documentation in accordance with N.J.A.C. 6A:11-2.1(g)." N.J.A.C. 6A:11-1.2. And "[f]inal granting of a charter" is defined as "the notification in which the Commissioner makes the charter effective as a result of all required documentation being submitted by the charter school and approved by the Department of Education in accordance with N.J.A.C. 6A:11-2.1(g) and (h)." N.J.A.C. 6A:11-1.2.
Franklin Township complains that the Act does not allow the system of approval pending further documentation contemplated by the regulations. Otherwise, it reasons, N.J.S.A. 18A:36A-4c would not have termed the Commissioner's granting power to be the "final authority."
The Township also objects because the regulations seem to permit two opportunities to appeal to the State Board: an appeal must be filed "within 30 days from the receipt of a letter from the Commissioner regarding either the approval or final granting or denial of a charter." N.J.A.C. 6A:11-2.5(a)(emphasis added). The Township finds such a double-appeal right unworkable:
However, how would such a process work? Would a board of education that waits to appeal a final grant of charter waive its right to object to aspects approved conditionally several months before hand? Or, if a board of education appeals after what purports to be only a conditional approval, does it waive its right to appeal a final grant of a charter? Can a board of education appeal both times? None of these questions can be satisfactorily answered, and the reason is because the Legislature never intended or even contemplated such an unworkable process.
As the State Board points out, this issue was addressed in the public-comment stage before adoption of the regulations. Two commenters objected to the double-appeal aspect of N.J.A.C. 6A:11-2.5(a), and the Department of Education responded as follows:
RESPONSE: The Department disagrees. N.J.S.A. 18A:36A-3 does state that the charter school shall be a public school operated independently of a district board of education. The Department of Education recognizes that charter schools approved in January will not have all of the necessary documentation to begin operations as schools at that time. Therefore, this two-level process was developed in the event that an application is approved but a school cannot ultimately open. The schools that are ready to open will receive the final granting of their charters when all documentation in accordance with N.J.A.C. 6A:11-2.1(g) and (h) is received, verified and approved by the Department.
In regard to the opportunities for appeal, the appeal at the time of the final granting can only relate to that documentation which the Commissioner needed from a charter school beyond what was submitted in the New Jersey Charter School Application. It is not a second opportunity for the district boards of education or superintendents of the State-operated school districts or the districts of residence of the charter schools to appeal the initial approval. An appeal on the initial approval must be made within 30 days of the approval or denial which will occur on or about January 15. An appeal on the final granting of the charter could be made within 30 days of the notification.

[29 N.J.R. 3493 (Aug. 4,1997).]
On this appeal the State Board argues that the regulations do nothing more than reasonably effectuate N.J.S.A. 18A:36A-3a, which authorizes the Commissioner to approve and grant charters. In our view, the appeal process contemplated by the regulations is idiosyncratic, if not unique. As explained by the Department in response to the comment, an aggrieved party may appeal first from the Commissioner's contingent approval (the contingency being the submission of further data) and second from the final granting after the data has been submitted. 29 N.J.R. 3493. While this double-appeal right is cumbersome, the charter school and the State Board persuasively argue that it is necessary and reasonable in order to establish a rational *39 approval process. For example, the school notes:
As a practical matter, the Franklin Charter [School] could not contract for a facility until the charter was awarded, since at the time of its application the Franklin Charter School had no funding that would allow it to commit to a facility. And absent award of a charter, with the resulting funding, how many landlords would agree to a contract not yet supported by a funding source?
The Act empowered the State Board to adopt regulations "necessary to effectuate" the Act. N.J.S.A. 18A:36A-18. A key aim of the Act, indeed the public policy of the State, is "to encourage and facilitate the development of charter schools." N.J.S.A. 18A:36A-2. The State Board developed a regulatory system that, in the exercise of its regulatory expertise, it found feasible to implement the Act in a practical way. While the State Board had no power to adopt regulations that were inconsistent with or antagonistic to the Act, it could establish a process reasonably designed to meet practical issues triggered by the Act's requirements. Cf. Ambrose v. Director, Div. of Taxation, 198 N.J.Super. 546, 552, 487 A.2d 1274 (App.Div. 1985) (regulation need not be grounded in "express statutory language," as long as it fulfills the Act's spirit and purpose). We find no violation of that responsibility.

V
Franklin Township argues that the Act is unconstitutional on its face because its funding schemediverting funds away from an existing district in order to pay for a charter schoolwill prevent existing districts from meeting their obligation under the State Constitution to provide a "thorough and efficient" education.
While conceding that the Abbott v. Burke line of cases invalidated school funding schemes only because of their unfair treatment of poorer districts, Franklin Township urges that the principles applied in those cases demonstrate the infirmities in the Charter School Program Act as well. Franklin Township embraces two key principles applied in "Abbott IV" (Abbott v. Burke, 149 N.J. 145, 693 A.2d 417 (1997)): 1) the amount of per-pupil spending is a pertinent consideration in determining whether the "t & e" obligation is satisfied; and 2) increased spending alone is not enoughany effective funding mechanism must be based on a study of the actual costs of providing a sufficient education.
The Charter School Program Act, reasons Franklin Township, violates these principles because it forces a reduction in per-pupil spending in the existing district, and, more important, it does so without any inquiry into the actual amount needed by the charter school or into the impact on the existing district.
Franklin Township denies that the coercive funding plana presumptive "90% of the local levy budget per pupil"can be justified by an expected reduction in the existing district's costs when some of its pupils leave to go to the charter school. First, it rejects the premise that there will be any significant savings because the district still will have the fixed costs associated with maintaining buildings and compensating staff. Second, it points out that some students in charter schools will have come from private or home schools and hence will not have been a prior financial drain on the existing district; yet the district now must pay the charter school for those students as well.
Franklin Township urges that the inevitable impact of charter schools will be to prevent local districts from satisfying their "t & e" obligation. As a result, such districts will suffer "the same financial problems now plaguing only the special needs [Abbott] districts."
In response both the Franklin Charter School and the State Board contend that 1) Franklin Township has no standing to invoke the State Constitution in this context, or in the alternative 2) its arguments are speculative and just plain wrong.
A. Standing
The Franklin Charter School argues that the constitutional right to a thorough *40 and efficient education "belongs to the children of New Jersey, not a local school board," nor does a local board have "a proprietary right to school funding"; hence Franklin Township has no standing to complain that the Act runs afoul of the "t & e" clause. The State Board likewise disputes the local board's power to assert the constitutional rights of students, saying because a school board is not a person, it may not allege a constitutional deprivation.
Conspicuously, neither the charter school nor the State Board cites any authority. In its reply brief Franklin Township relies upon Secaucus v. Hudson Cty. Bd. of Taxation, 133 N.J. 482, 628 A.2d 288 (1993), cert. denied, 510 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994), in which the Court held that a county board of taxation had standing to argue in favor of the constitutionality of a statute exempting certain municipalities from paying taxes to support county vocational schools. The Court applied the traditional criteria for gauging standingwhether the party has a sufficient stake in and real adverseness with respect to the subject matter, and whether the party will be harmed by an unfavorable decision. 133 N.J. at 491-92, 628 A.2d 288. By those measures, the Court concluded, the county board (HCBT) "clearly" had standing. Id. at 492, 628 A.2d 288. The Court reasoned as follows:
[T]he decision here will affect how the county tax board calculates the municipalities' apportioned share of county taxes. County boards of taxation are regarded as state agencies with the jurisdiction, authority, and responsibility over county taxes. N.J.S.A. 54:3-11; see DeFeo v. Smith, 17 N.J. 183, 188, 110 A.2d 553 (1955). As a state agency, HCBT will be affected by the determination of the constitutionality of the statute it is charged with enforcing.

[Ibid.]
In Kenney v. East Brunswick Tp., 172 N.J.Super. 45, 49-50, 410 A.2d 713 (App.Div. 1980), the court approved the standing of a township to challenge the constitutionality of a statute requiring it to expend public funds.
Franklin Township reasonably argues that as the delegate of the State Board, it is constitutionally charged with the "t & e" duty, and that the funding portion of the Charter School Program Act threatens to impair its ability to perform that duty by reducing its available funds. Moreover, Franklin Township also points out that the Act confers upon local districts the "exclusive" right to comment on an application and to appeal a grant. Hence, a local board should perforce be deemed to have standing to challenge the underlying statute. We recognize Franklin Township's standing to allege that the Act will thwart its "t & e" efforts.
B. The validity of the Act under the "t & e" clause
In response to Franklin Township's insistence that the funding mandate will cripple its ability to satisfy the "t & e" duty, the Franklin Charter School argues that the allegation is "nothing more than unsubstantiated speculation," and that the most recent school funding act, N.J.S.A. 18A:7F-1 to -34, the Comprehensive Education Improvement and Funding Act (CEIFA), will "ensure that all school districts will have the resources to provide a thorough and efficient education."
With respect to Franklin Township's argument about students formerly in private or home schools, the school counters:
Any student not currently enrolled in the Franklin public schools who has applied to the Charter School, if admitted, must first register in the District. Consequently, any funding for such student will come from the State and pass through the Board of Education before being allocated to the Charter School. N.J.A.C. 6A:11-7.2(j). Thus, the Board of Education will not lose any additional [State] funds from the enrollment of such children in the Franklin Charter School.
The State Board, besides restating the school's counterarguments, discredits Franklin Township's reliance on Abbott IV, distinguishing it as applicable only to the unique circumstances of poor urban districts.
In its reply brief Franklin Township insists that its plea of fiscal doom is not speculative. It points to the Department of Education's estimate that the planned 100-student enrollment *41 in the charter school will cost the existing district $583,068. And it laments that the State Board
offers no suggestions on how the appellant could reduce its budget by that amount without an impact on T & E. Since about 90% of a district's budget is comprised of fixed costs related to staff (salaries, stipends, insurance and other benefits) the only way to save a half million dollars is to eliminate about 15 teachers.
Further, Franklin Township rejects the contention that it will receive a windfall in new state aid for those charter-school students who formerly went to private or home schools. It points out that state aid must be turned over to the charter school, by virtue of the last sentence of N.J.S.A. 18A:36A-12: "The district of residence shall also pay directly to the charter school any categorical aid attributable to the student...."
We reject Franklin Township's facial attack on the funding portion of the statute. The Franklin Charter School is not scheduled to open until September 1999. Not until the school has operated for at least a year, or perhaps more, will it be possible to gauge whether its presence is subverting the district's ability to provide a constitutionally adequate education for its regular students. For all we know now, the presence of the charter school and the reduced availability of tax money may prompt the district to adopt more cost-effective practices and to pursue teaching innovations; this may possibly result in a better education for its students. Of course, the opposite could prove true, but the remedy for that eventuality must await a new litigation challenge brought after the alleged pernicious impact has occurred and is demonstrable. If a district cannot meet "t & e" muster because of charter school financial drain, new compensatory state funding is also a possible remedy. The school district's claim, at the moment, is too abstract.
Moreover, Franklin Township's argument is diluted by one of its premises, namely, that the district "must" pay 90% of its per-pupil cost. In fact, N.J.S.A. 18A:36A-12 establishes the 90% figure as a "presumptive amount," which the Commissioner in his discretion may raise or lower at the time the charter is granted. And the regulations allow for yearly adjustments in the district's assessment. N.J.A.C. 6A:11-7.3(e). Thus, Franklin Township's facial attack does not overcome the strong presumption that an education statute purporting to implement the "t & e" clause is valid. Abbott v. Burke, 149 N.J. at 174, 693 A.2d 417.

VI
In an argument related to Franklin Township's preceding issue, the Clifton board contends that the Commissioner's decision should be overturned because he failed to consider a key policy behind the Act, namely, the fiscal impact of the charter school on the existing district. The Clifton Board invokes the principle of judicial review that a court must decide whether an "agency's action violates express or implied legislative policies." Matter of Musick, 143 N.J. 206, 216, 670 A.2d 11 (1996).
In support of its premise that the Act demands the Commissioner consider the effect on the existing district, Clifton points out that the district's statutory 90% contribution is merely the presumptive amount, which the Commissioner may raise or lower in his discretion:
At the discretion of the commissioner and at the time the charter is granted, the commissioner may require the school district of residence to pay directly to the charter school for each student enrolled in the charter school an amount equal to less than 90% percent or an amount which shall not exceed 100% of the local levy budget per pupil for the specific grade level in the district of residence.

[N.J.S.A. 18A:36A-12.]
Clifton represents that it will have to pay nearly $700,000 for the projected 100 charter school students for 1998-99, a loss that caused it to seek a substantial tax increase for its 1998-99 budget, and which will disrupt its historical record of "penurious" budgeting.
Classical Academy disputes the premise that the Act requires "the Commissioner to conduct any study of the impact that his funding decision might have on the district of *42 residence." Rather, the second sentence of N.J.S.A. 18A:36-12 means that the Commissioner may revise the presumptive amount only as needed "to meet the financial needs of the charter school," not of the existing district. Classical Academy also observes that the regulations contemplate a reduction in the allocation only if the charter school has accumulated an excessive surplus in the previous year. Nowhere do the regulations permit factoring in the adverse impact on the district. Moreover, the charter school reasons that the charter school system, by its nature, will always take money away from local districts, a consequence that is overcome by the Legislature's public policy decision that charter schools are in the best interests of New Jersey's students.
The State Board contends that "the Commissioner can not be faulted for not evaluating the consequences of establishing a charter school within the district when he is under no legislative mandate to do so." It also contests Clifton's standing to challenge the funding provision, in that, as a school district, Clifton is a creature of the Legislature and thus must operate under the conditions which the Legislature imposes on it.
For the reasons already expressed above, we conclude Clifton has standing to attack the validity of a statute requiring it to spend public money. See Secaucus, 133 N.J. at 492, 628 A.2d 288; Kenney, 172 N.J.Super. at 49-50, 410 A.2d 713. We agree with Classical Academy and the State Board that the Act does not require the Commissioner to take into account the charter school's effect on the existing district's finances. Clifton and the other appellants, with some persuasion, predict severe budgetary problems, as the per-pupil amounts they will have to pay out will not be equalled, or even approximated, by the amounts they may save in not needing to educate the departing students. But that potential adverse result was the choice of the Legislature, which decided to create charter schools and to fund them from existing districts' budgets instead of appropriating new funds for that specific purpose. And it was the Legislature's choice not to include the impact on the existing district among the criteria for approval of the charter. Clifton's remedy for this alleged omission must be sought from the politically responsive branches of government, the Executive and the Legislature, not the courts. See County of Camden v. Waldman, 292 N.J.Super. 268, 291-92, 678 A.2d 1101 (App.Div.1996), certif. denied, 149 N.J. 140, 693 A.2d 109, 110 (1997).

VII
Englewood asserts a potpourri of ways that the Act violates various education laws: 1) the Act does not require charter schools to conduct public hearings on their budgets, as public schools are required to do by the school budget statute, N.J.S.A. 18A:22-7 to13; 2) the Act does not require a study of the impact on the existing district, as does the law governing the sending-receiving relationships, N.J.S.A. 18A:38-13; and 3) by allowing a charter school's board of trustees to be appointed by the school's founders, the Act breaches the prohibition against "the delegation of public functions to private parties," and it also violates "long standing principles reflected in N.J.S.A. 18A:14-1 et seq.," the school election law.
Neither the Palisades school nor the State Board specifically responds to these points. The State Board answers Englewood generally by stating that the State Constitution confers upon the Legislature the duty to establish a thorough and efficient system of public education, and thus the Legislature is free to establish any form of public education it deems appropriate, even a non-traditional form such as charter schools.
The very nub, philosophically, of the charter-school concept, is to free charter schools from many of the statutory and regulatory strictures to which regular public schools are captive. That freedom from regulation promises a concomitant public benefit, namely, the charter schools' obligation to improve student performance, an obligation termed by the law itself as a "new form of accountability." N.J.S.A. 18A:36A-2. The fact that charter schools do not comply with the laws and conventions cited by Englewood is doubtless an intended effect of the Act. As long as the Act is otherwise free from federal or state constitutional defects, as we conclude *43 elsewhere it is, the Act need not be evaluated by its compliance with other, traditional school laws which are not specifically applicable to these nascent institutions.

VIII
Englewood contends that the Charter School Program Act violates the following paragraph of the New Jersey Constitution: "No donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatever." N.J. Const. art. VIII, § 3, ¶ 3.
The purpose of this clause is to ensure that public money is used only for public purposes. Mt. Laurel Tp. v. Public Advocate of N.J., 83 N.J. 522, 534, 416 A.2d 886 (1980). What constitutes a "public purpose" is broadly construed: the concept connotes "an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government." Bryant v. City of Atlantic City, 309 N.J.Super. 596, 611, 707 A.2d 1072 (App.Div.1998) (quoting Roe v. Kervick, 42 N.J. 191, 207, 199 A.2d 834 (1964)). "[T]he determination of what constitutes a public purpose is primarily a function of the Legislature." Bryant, 309 N.J.Super. at 611, 707 A.2d 1072.
In the Charter School Program Act the Legislature repeatedly declared that charter schools served a public purpose, a fact emphasized by the State Board in answering Englewood's argument. Thus, charter schools are "part of this State's program of public education" and are in "the best interests of the students of this State." N.J.S.A. 18A:36A-2. Though operated by a board of trustees independent of the local board, a charter school is a "public school" and its board of trustees are "deemed to be public agents." N.J.S.A. 18A:36A-3a. And the charter school, while free of most regulations, is subject to oversight by the Commissioner, who may revoke a charter at any time. N.J.S.A. 18A:36A-17.
Englewood complains that the funds collected by the charter school
can be applied to the improvement of private property and finance the operation of what is in reality a form of private school since there is no public board of education, there is no public hearing on the use of funds, there is no public vote or input through elected officials on a school budget; and, the full requirements in law to control spending of public funds are not present.
In its reply brief Englewood acknowledges that the Act itself declares the charter school to be public, but it maintains that the key question is whether there is any possibility that the funds might be "used for private purposes." It explains:
The absence of a facility is a clear example of such. N.J.S.A. 18A:36A-10 requires that public funds not be used to construct a facility. With no identification hereof, the location and nature of the facility, it is unclear how public funds will be involved in construction or renovation. On this record, respondents cannot convincingly argue that this approval will not violate the constitutional prohibition against use of public funds for private purposes. Simply calling the proposal a public school, which no one can yet identify as to location and facility, does not remove the problem.
Englewood cannot establish a violation of N.J. Const. art. VIII, § 3, ¶ 3 on the basis of a mere possibility that some of the charter school funds might be spent illegally. The Act itself creates a remedy for such a violation: the Commissioner may non-renew or revoke the charter, or may place a school on probationary status. N.J.S.A. 18A:36A-17. And the elected school board in the existing districtnot the charter school's board of trustees establishes the amount of the charter school's budget, in that the charter school can only spend the amount determined by the district of residence in its budget process. N.J.S.A. 18A:36A-12. We conclude the Act does not violate N.J. Const. art. VIII, § 3, ¶ 3.

IX
In a point related to that raised by Englewood in VIII, Franklin Township argues that the Charter School Program Act *44 improperly delegates legislative authority to a private body, namely, a board of trustees neither elected by voters nor appointed by an elected official. It claims that such a delegation runs afoul of the Fourteenth Amendment and the following clause of the New Jersey Constitution: "The legislative power shall be vested in a Senate and General Assembly." N.J. Const. art. IV, § 1, ¶ 1.
Our Supreme Court has defined the problem of improper delegation as follows:
Both state and federal doctrines of substantive due process prohibit delegations of governmental policy-making power to private groups where a serious potential for self-serving action is created thereby. To be constitutionally sustainable, a delegation must be narrowly limited, reasonable, and surrounded with stringent safeguards to protect against the possibility of arbitrary or self-serving action detrimental to third parties or the public good generally.

[Ridgefield Park Educ. Assn. v. Ridgefield Park Bd. of Educ. 78 N.J. 144, 163-64, 393 A.2d 278 (1978) (citations omitted).]
Franklin Township contends that there is "a serious potential for self-serving action" here, because "two of the founding trustees have loaned funds to the charter school and one of those persons is designated as an ex officio trustee and is slated to have the highest paid position in the charter school, that of headmaster." And it laments the lack of safeguards over the board of trustees, which is free to spend money without "a budget vote or any determination by elected officials." It also observes that "there is nothing to prevent all the schools of a district from being taken over by one or more charter schools, leaving the elected or appointed board as a powerless body, existing only to sign tax money over to privately controlled charter schools."
Franklin Charter School and the State Board correctly point out, as discussed in VIII, that charter schools are not private within the meaning of the no-delegation principle; they are subject to control by the Commissioner and must meet the Act's standards in order to maintain their charters.
A similar theory was rejected by the Michigan Supreme Court in upholding that state's charter school law. In Council of Organizations v. Governor, 455 Mich. 557, 566 N.W.2d 208 (1997), the trial court had stricken the law as being violative of the state constitution's mandates that public schools be under the "immediate, exclusive control of the state," that public schools be governed by publicly elected bodies, and that they be under the supervision of the State Board of Education. The Supreme Court disagreed, finding no constitutional breach. First, the court rejected the claim that charter schools were not under the state's control: a charter could be revoked if the school violated its charter or the act; the state Department of Education exercised control through the application-approval process; funding of the charter schools came from public money; and charter schools were subject to other sections of the public-education laws. Id. at 216-17.
Second, the Michigan court found it unobjectionable that the charter schools were to be run by a private board of directors not selected by the public or by a state agency. It stated that the legislature had mandated the selection process, which could be changed at any time, and that the bodies authorized to approve a charter school were themselves either elected or appointed by public bodies. Id. at 217-18. And the court found no requirement in the constitution that public schools be controlled by the voters of the local district; rather, public education was intended to be under the control of the legislature. Id. at 218-19. Third, the court found that the act did not divest the State Board of Education of its duty to supervise public education, in that the act expressly declared that charter schools were "public schools." Id. at 221. These principles sustain New Jersey's Act as well. Franklin Township has not established an unconstitutional delegation of legislative authority.

X
Englewood and Clifton both argue that the Charter School Program Act is unconstitutional because it fails to extend to the local *45 school district the right to some kind of a plenary hearing on the merits of the charter-school application. They claim that a hearing is a necessary component of their right to procedural due process, a right grounded in their property interest in preserving their tax dollars in order to safeguard their students' fundamental right to a thorough and efficient education. A hearing is the form of process they claim is due, appellants argue, because the Commissioner acts in a quasi-judicial capacity when he evaluates a charter-school application.
Both respondent-schools and the State Board counter with variations on three themes: 1) a local board, as a creature of the Legislature, has no standing to raise due process objections to state action; 2) even if a local board could assert such a challenge, the boards in this case lack the kind of property interest in the alleged lost funding that is a prerequisite to a due process deprivation; and 3) even if the boards could assert a qualifying deprivation, they would not be entitled to a hearing, as the Commissioner acts in a legislative, not a quasi-judicial capacity, when he assesses a charter-school application.
A. Whether appellants may assert a procedural-due-process claim.
The threshold question is whether local boards of education, by virtue of their legal status and financial stake, may assert a right to a hearing as a matter of procedural due process under the Fourteenth Amendment.
The two schools rely on dicta in Board of Educ., Plainfield v. Cooperman, 105 N.J. 587, 523 A.2d 655 (1987). In that case two school boards and two students challenged the State's regulation governing the exclusion from school of HIV-infected students. Among their arguments was that the procedures allowed exclusion without prior notice and hearing, in violation of their constitutional rights to due process. Id. at 598, 523 A.2d 655. In a footnote the Supreme Court narrowed this theory as follows:
This applies to the individual parties involved in the dispute, not to the school boards. The school boards are State agencies, public entities whose power are delegated to them by the state legislature. See N.J.S.A. 18A:10-1 to 18A:12-20. Because school boards are themselves agents of the State, it would be a misstatement in this context to ascribe to school boards due process rights against improper state action.

[Id. at 598-99 n. 5, 523 A.2d 655.]
The State Board adds that local boards, as subdivisions of the State, are not "persons" who are entitled to assert that a state law violates their own rights to procedural due process. See, e.g., Newark v. New Jersey, 262 U.S. 192, 196, 43 S.Ct. 539, 67 L.Ed. 943, 946 (1923) (City of Newark may not invoke the restraints of the Fourteenth Amendment against the State) (cited with approval, albeit in dicta, in McKenney v. Byrne, 82 N.J. 304, 315 n. 4, 412 A.2d 1041 (1980)).
In Borough of Pitman v. Skokowski, 193 N.J.Super. 215, 220-21, 473 A.2d 100 (App. Div.1984), this court held that a borough could not challenge a state statute that had the effect of disrupting its budget for the year in question. We reasoned:
A municipality is a creature of the state and thus necessarily subordinate to its creator and can exercise only such powers as may be granted to it by the Legislature. As a political subdivision of the State, a municipality owes its very existence to the State and the extent of its powers and its privileges is entirely subject to the ultimate authority of the legislative process. Thus a municipality's budgetary powers under the local budget law, N.J.S.A. 40A:4-1 et seq., and the local government CAP law, N.J.S.A. 40A:4-45.1 et seq. are, like the budgetary process exercised by a county, clearly subject to the dominion of the Legislature.
By virtue of being a political subdivision of the State, a municipality such as the Borough has no standing to invoke the protection of the Fourteenth Amendment against the State. Since a municipality exercises only such powers and possesses such privileges as are vested in it by the Legislature, it possesses no powers or *46 privileges which cannot be altered or withdrawn at the will of the Legislature.
In undertaking public functions a municipality possesses no rights which it may assert to prevent the Legislature from altering the municipal powers or ability to carry out these functions in whatever way the Legislature may see fit. Rather, the Legislature has complete control over restrictions that may be placed upon municipal spending.

[Ibid. (citations omitted).]
Other decisions, however, have taken a less formalistic approach, in the interest of reaching the merits of a public-policy controversy. Thus, in Cedar Grove v. Sheridan, 209 N.J.Super. 267, 272-73, 507 A.2d 304 (App. Div.), certif. denied, 104 N.J. 464, 517 A.2d 448 (1986), the court declined to take a technical approach to standing  exemplified by Skokowski and chose to reach the merits of a municipality's procedural-due-process challenge to the Department of Transportation's decision to install a traffic light; we stressed that the municipality had a sufficient stake in the subject matter, namely, its interest in controlling traffic within its borders. But we held that the municipality was not entitled to a predetermination hearing. Hence, consistent with our courts' trend toward liberality in standing, we allow the present appellants to assert their right-to-hearing theory. However, we reject it on its merits for the reason given below.
B. Whether appellants were entitled to a hearing on the merits of the charter-school application.
One asserting a constitutional right to a hearing must establish two prerequisites: "(1) contested factual issues which may be presented in an evidentiary manner in proceedings which are targeted at a person, group of persons or entity, and (2) particularized property rights or other special interests." Cedar Grove, 209 N.J.Super. at 275, 507 A.2d 304. This court in Cedar Grove observed that when the Department of Transportation decided issues of traffic-light placement, it was acting in its legislative capacity pursuant to regulations promulgated under authority of the Legislature. Its decision-making process was in the nature of an investigatory proceeding, not an adversarial one, and thus did not require a hearing or findings of fact. Id. at 278-79, 507 A.2d 304. We acknowledged that some local interests were adversely affected, but we said that those interests were outweighed by the overriding public interest. Id. at 279, 507 A.2d 304.
Treating first the requirement that there be contested factual issues susceptible of adjudication, we disagree with appellants' insistence that there are such issues. The State Board persuasively argues that the Commissioner investigating a charter-school application is acting in his legislative capacity, not in a quasi-judicial capacity:
In this matter, a determination was made by the Commissioner as to whether the application to form a charter school was complete and worthy of receiving the charter. There was no need to gather evidence or apply law to found facts in order to reach this determination. The Commissioner's determination to grant a charter is more akin to a legislative or executive function on the part of the Commissioner. Therefore, neither the applicant for a charter nor a local school district has a right to a hearing prior to a determination by the Commissioner or State Board as to whether a charter should be granted.
[citing High Horizons Dev. v. Department of Transp., 120 N.J. 40, 50, 575 A.2d 1360 (1990) (hearing required when agency acts in quasi-judicial, as opposed to legislative, capacity).]
Both schools analogize the grant of a charter to the grant of a permit by a state agency, which is not adjudicatory and which does not implicate the strictures of constitutional due process. See, e.g., High Horizons, 120 N.J. at 52, 575 A.2d 1360.
For example, in East Windsor Reg'l Bd. of Educ. v. State Bd. of Educ., 172 N.J.Super. 547, 412 A.2d 1320 (App.Div.1980), a local board of education appealed from decisions of the Commissioner and State Board reducing the amount by which the local board sought to increase its budget above the permissible rate of increase (a "cap waiver"). *47 Cap-waiver decisions were governed by a statute empowering the Commissioner to assess whether the requested waiver was necessary to enable the district to meet its "t & e" obligation. We rejected the local board's contention that the matter necessitated a hearing and formal fact-findings and conclusions:
The type of proceeding here involved is plainly legislative in nature, and not quasi judicial. The proceedings here were not a contested case or one of an adversary nature. The agency was not under a duty to consider evidence and apply the law to the facts as found, thereby exercising a discretion or judgment judicial in nature on evidentiary facts. See Handlon v. Belleville, 4 N.J. 99, 104 [71 A.2d 624] (1950). The Commissioner was not called upon to evaluate evidence. There was no formal testimony to be taken, no witnesses to be heard and no credibility to be judged. Cf. In re Modern Indus. Waste Service Appeal [In re Modern Indus. Waste Service], 153 N.J.Super. 232, 240 [379 A.2d 476] (App.Div.1977). Instead, he was simply required to apply his expertise to a set of facts and figures and determine whether the cap waiver requested by the board was necessary, in whole or in part, to enable the school district to provide a thorough and efficient education to its students. The board was afforded full opportunity to submit its request accompanied by supporting data.

[Id. at 551-52, 412 A.2d 1320.]
We added that, on appeal from a decision by an agency acting in a legislative capacity, the reviewing court may glean the agency's reasons from the record as a whole; there need not be the kind of formalized decision necessary in a contested case. Id. at 552-53, 412 A.2d 1320.
The Legislature has decreed that charter schools are an important and necessary component of an effective educational system. It granted local boards a role in the approval processthe opportunity to respond in writing to a proposed charter school's application and to appeal from the grant of a charter. N.J.S.A. 18A:36A-4c. & d. It did not see fit to also grant the right to an adjudicatory hearing.
The Commissioner's approval process is supposed to guarantee that the application supplies all the required information. The process is not an adjudicatory one in which there are contested issues of fact subject to questioning and cross-examination. The application is more in the nature of a business plan. If the plan proves illusory or ineffective, the Act grants a remedythe Commissioner may revoke the charter or order changes. N.J.S.A. 18A:36A-17. But at the application stage, there is no fact dispute of the kind susceptible of resolution by traditional hearing procedures. Having concluded that there are no adjudicable fact issues, we need not reach the second, conjunctive element: whether appellants had a sufficient property interest or other stake in the outcome. We conclude the Act is not unconstitutional for failing to extend a hearing right to the school district.

XI
All three appellants argue that the Charter School Program Act is unconstitutional because it breaches the equal protection rights of parents and students in the existing school districts, to the advantage of the charter schools. As each appellant grounds its equal protection theory in different sources, we will treat each argument separately.
A. Englewood
Englewood rests its equal protection theory on Article I, paragraph 1 of the New Jersey Constitution. This provision
All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

[N.J. Const. art. I, ¶ 1.]
has been construed as prohibiting the State from adopting statutory classifications which treat similarly situated persons differently. Sanchez v. Department of Human Servs., 314 N.J.Super. 11, 30, 713 A.2d 1056 (App. *48 Div.1998). In assessing equal protection challenges under the State Constitution, our courts have rejected the two-tiered analytical framework (strict scrutiny vs. rational basis) used to resolve such challenges under the Fourteenth Amendment. Rutgers Council of AAUP v. Rutgers, 298 N.J.Super. 442, 452, 689 A.2d 828 (App.Div.1997), certif. denied, 153 N.J. 48, 707 A.2d 151 (1998). Instead, our courts employ a balancing test: whether there is an appropriate governmental interest that is suitably furthered by the differential treatment. Ibid. The three pertinent factors in striking the balance are "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." Greenberg v. Kimmelman, 99 N.J. 552, 567, 494 A.2d 294 (1985).
Englewood argues that the Charter School Program Act creates two "categories of education supported by public funds": 1) the existing school district, and 2) the charter school. These classifications are constitutionally defective, reasons Englewood, because their effect is "to disadvantage students in the existing public school education program(s) with respect to their peers in the charter schools. A system of separate schools as established under the Charter School Act has a detrimental impact upon the financial and educational aspects of public schools."
The State Board asks us not to consider Englewood's claim, invoking the principle, discussed also in V, that as a political subdivision of the State, a local board of education may not assert an equal protection deprivation at the hands of the State. See Newark v. New Jersey, 262 U.S. at 196, 43 S.Ct. at 540, 67 L.Ed. at 946; McKenney v. Byrne, 82 N.J. at 315 n. 4, 412 A.2d 1041; Borough of Pitman v. Skokowski, 193 N.J.Super. at 220-21, 473 A.2d 100; Glassboro v. Byrne, 141 N.J.Super. 19, 23, 357 A.2d 65 (App.Div.), certif. denied, 71 N.J. 518-19, 366 A.2d 674 (1976). While a political subdivision may be able to challenge the validity of a statute on some other constitutional ground, it may not claim a denial of equal protection as to itself. Kenney v. East Brunswick Tp., 172 N.J.Super. at 50 n. 2, 410 A.2d 713.
Thus, while we could decline to reach appellants' equal protection theories, because of the public interest and continuing controversy over the validity of the Act exemplified by at least seven other pending appeals, we proceed to the merits.
Englewood is correct that all public school students have the "fundamental right" to access to the same quality level of education, no matter what the economic status of their district. But Englewood conspicuously fails to explain how students in the existing district will be treated less favorably than charter school students. Indeed, Englewood's theme throughout has been that the diversion of funding from the district to the charter school will impair its ability to meet the needs of its own students. But even if that turns out as true, it does not necessarily follow that the charter school's students will receive better or favored treatment, the prerequisite of an equal protection violation.
The State Board persuasively refutes Englewood's claim of disparate treatment:
90% of the local levy budget per pupil is forwarded to the charter school to educate each pupil who resides in the district who attends the charter school. The Board is permitted to retain 100% of the local levy budget per pupil for the students who remain in the district's schools. It is difficult to determine how the financing of the charter schools disadvantages public school pupils in comparison to the charter school pupils. Plainly, the Board's appeal to equal protection principles should be disregarded.
Applying the extant balancing test, we conclude that the two categories created by the Act are reasonably designed to further the appropriate governmental intent of "promoting comprehensive education reform by providing a mechanism for the implementation of a variety of education approaches which may not be available in the traditional public school classroom." N.J.S.A. 18A:36A-2. Englewood fails to show us that the Act's classification "intrudes upon" students' right to equal access to a quality education.
*49 B. Franklin Township
Franklin Township grounds its equal protection claim in a different section of the State Constitution: Article I, paragraph 5. It reads:
No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right, nor be segregated in the militia or in the public schools, because of religious principles, race, color, ancestry or national origin.

[N.J. Const. art. I, ¶5.]
Curiously, however, Franklin Township does not allege any unfair treatment "because of religious principles, race, color, ancestry or national origin." Thus we fail to see how this section has even arguable relevance. The content of Franklin Township's argument suggests that it meant to invoke the more general and traditional source of equal protection: N.J. Const. art I, ¶ 1, quoted above. We examine this appellant's point under that clause.
Franklin Township alleges a denial of equal protection to both students and parents from the existing district. As to students, it reasons:
The inequality of the Charter School Act is the fact that as charter schools grow the per-pupil expenditures for public students will decrease steadily, almost without limit, while the per pupil expenditures for charter school students will remain guaranteed by law, even if in excess of an amount required for T & E. Such an inequality is clearly not required by any state interest. Indeed, charter schools could easily exist without burdening local taxpayers or taking money for public school students. The statute would merely need to be amended to make charter schools receive funding directly from the state.
As to parents, Franklin Township contends that the taxes paid by public school parents will be used to pay for charter school students as well as for their own students, while the parents of charter school students "get a fully paid charter school education for their children without paying any more in taxes than the parent with children in the public school." Moreover, it complains,
the parents of public school students have no control over the spending of charter schools, while the parents of charter school students retain the power to vote down a district's spending proposal for the public school students with complete impunity. Even if a district's pending plan is defeated by the voters and the budget is then reduced, the funding for the charter school is fully guaranteed and will be paid by the district, regardless of the amount of funds left for operation of the district.
In our view, Franklin Township does not persuasively establish the premises of its theory of differential treatment. It is by no means obvious that per-pupil spending in the district must decrease in order to maintain a guaranteed level of spending in the charter school. Charter schools will collect a percentage (presumptively, ninety percent) of the existing schools' per-pupil spending. Any reduction in state aid to the district will result in a lesser sum available to the charter school as well. Charter schools are part of the public school system; they must meet "t & e" standards just as existing districts must. While it may be true that the gross amount of money available to the existing schools will be less than before, the charter schools will not have more than the existing districts. Indeed, one optimistic goal underlying the charter school movement is to reduce per-pupil spending while increasing learning and performance.
Similarly, with respect to Franklin Township's argument about parents, both charter-school parents and other parents will pay the same amount of taxes; parents with children in the existing district will not pay any more. And all parents are free to apply to send their children to the charter school. Parents retain control over the total amount allocated to charter schools, in that they can vote on the district's budget, from which the charter school receives its percentage share. In sum, Franklin Township has not established an invidious classification.
*50 C. Clifton
Clifton bases its equal protection argument on the Fourteenth Amendment to the Federal Constitution. It perceives two defects. First, it complains that the Charter School Program Act does not require that a charter school's board of trustees be elected by the voters of the district; rather, it permits the board to be appointed if the school so chooses. Hence the Act in effect violates the principle of "one man [person], one vote," as the district's voters have no say in the operation of one of the district's systems of public education. Clifton claims that the voters have a constitutional right to elect those in charge of public education in the district. Second, Clifton contends that this appointed-board feature of the Act also prevents the voters from voting on the charter school's annual budget, which they have a constitutional right to do.
The Act does not decree the mode of selecting the board of trustees. Rather, it leaves this task to the founders to choose and implement a method of selection, which may be either appointment or election. N.J.S.A. 18A:36A-5. According to Classical Academy's application, the first board of trustees (for 1998-99) would be appointed by the school's director. In each of the next three school years, three of the nine appointed directors stand for election by parents of the charter school students. From 2002 on, yearly elections will be held to select the three board members whose three-year terms have expired; again, only charter-school parents may vote.
Absent from Clifton's argument is any authority for its premise that the voters of a school district have a constitutional right to vote for a school board or for a school budget. In its brief the State Board correctly observes that there is no such right. In its reply brief Clifton concedes the point but rephrases its argument: when a state chooses to provide for elected school board members, each voter is entitled to participate on an equal basis (the "one man [person], one vote" principle). But, Clifton reasons, the Charter School Program Act, by allowing only charter school parents to vote for their board of trustees, and by allowing the board of trustees to control the spending of tax dollars, "effectively denies the Clifton voter his or her constitutional right to have any say in the selection of the charter school trustees or in the composition of the charter school budget." Clifton relies on Franklin Tp. v. Board of Educ., 74 N.J. 345, 352-55, 378 A.2d 218 (1977), cert. denied, 435 U.S. 950, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978), holding that the "one man [person], one vote" stricture applies to the apportionment of seats on a regional high school board, so that a statutory formula which apportioned seats unequally diluted voting rights and violated the Fourteenth Amendment.
The State Board cogently argues that denial or dilution of the right to vote is not implicated. The State Constitution empowers the Legislature to provide a system of public education. In the traditional system developed by the Legislature, there are Type I and Type II districts; the school boards of the former are appointed, while those of the latter (such as Clifton) are elected. N.J.S.A. 18A:12-7; N.J.S.A. 18A:12-11. Voters in Type I districts do not vote on the budget, while those in Type II districts do. N.J.S.A. 18A:22-14; N.J.S.A. 18A:22-33. With the Charter School Program Act the Legislature created a third type of public education format; it chose not to require that the governing board of charter schools be elected by the voters of the district; it also chose to permit the board of trustees to approve the budget. Just as the Legislature could validly opt to make distinctions between our two types of traditional districts, it could also do so with respect to charter schools.
No registered voters in the school district are per se eligible or "qualified" to vote on charter-school matters. Hence they are not protected by the "one man [person], one vote" rule. See Reynolds v. Sims, 377 U.S. 533, 554, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506, 523 (1964) (observing that the Constitution guarantees the right to vote to all "qualified voters"); Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) (one-person one-vote principle may not be diluted in school district election). All registered voters within the Clifton School District have an equal vote; no person's vote *51 is diluted; a registered voter simply has no vote on issues concerning governance of the charter school.
With respect to budget matters, as discussed above, it is not true that the district's voters lack control over the charter school's budget: the voters will approve the district's budget, which includes the allocation for the charter school. That amount is one of many line items in the district's budget. Just as the voters have no approval power over traditional line items, they have no such power over the charter-school allocation in itself. Clifton fails to establish that there are two sets of equally-situated voters, one set denied the right to vote.
Finally, we decline to address specifically the issues raised by the amicus curiae, Morris School District, which has an appeal pending before the State Board at present.
Affirmed.